Receipt number AUSFCC-9415619

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STATE OF ALASKA,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

Civil Action No. ___24-396 L___

## COMPLAINT

Plaintiff, the State of Alaska, brings this action against Defendant, the United States of America, and for its causes of action alleges as follows:

### INTRODUCTION

1.      In 1976, the United States, the State of Alaska, and an Alaska Native corporation—the Cook Inlet Region, Inc. (CIRI)—agreed to the largest land exchange in American history.

2.      Through the Cook Inlet Land Exchange, the State relinquished its land rights to nearly 700,000 acres of land. With the State's and CIRI's relinquished land selections, the United States created the Lake Clark National Park and Preserve, a jewel of the National Park System.

3.      The State, in return, received federal lands that had previously been set aside for conservation purposes but were known to have enormous mineral potential.

4.      To secure its mineral rights in its new lands, Alaska insisted that the Land Exchange guarantee that the State's new lands "shall include mineral deposits" and the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct."

5.      These lands and mineral rights were critical to the continued well-being of Alaska, which has long relied on its resource-rich lands to fund the State and local governments and provide for the needs of its people.

6.     Decades later, the largest undeveloped copper deposit in the world was discovered on the lands the State received in the Land Exchange.

7.     Known as the Pebble Deposit, the State's lands contain more than 57 *billion* pounds of copper, in addition to enormous quantities of gold, silver, and rare earth elements.

8.     In line with its longstanding plans, the State wants to lease its lands for mining. Mining these minerals would provide billions of dollars in taxes, fees, and royalty payments to the State, as well as create thousands of jobs for Alaskans.

9.     Yet despite the United States' past memorialized promises, the EPA recently issued an unprecedented order (the "Final Determination") that effectively prohibits *any* mining from occurring on these State-owned lands.

10.    Guided by the desire to "conserve and restore [Alaska's] most cherished lands and waters, many of which are sacred to Tribal Nations," the Final Determination effectively turns the State-owned lands into a massive federal preserve. *Biden-Harris Administration Announces Action to Help Protect Bristol Bay Salmon Fisheries*, U.S. EPA (Jan. 31, 2023), bit.ly/3WBmRnn.

11.    Indeed, the Final Determination covers about 309 square miles of State-owned lands— an area that is nearly *five times* the size of the District of Columbia.

12.    The Final Determination has deprived the State of all the lands' value because there is no other economically productive activity that can occur on these lands. The lands are far from civilization (the nearest villages are 17 miles away). The lands are serviced by no roads, airport, or train, and are accessible only by helicopter or snowmobile.

13.    In short, mining is the *only* economically productive activity that can occur on these lands.

14.    This action is brought by the State of Alaska to ensure that it recovers damages and just compensation for the United States' unprecedented restrictions imposed on the State's lands.

15.     If the United States wants to seize Alaskan lands to create another federal preserve, it must at the very least pay for it. The United States cannot "'force [Alaska] alone to bear public burdens which, in all fairness and justice, should be borne by the [American] public as a whole.'" *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 537 (2005).

16.     The State is entitled to damages because the United States has breached its contracts with Alaska, and the State is entitled to just compensation for the taking of Alaska's property.

## JURISDICTION

17.     This Court has jurisdiction under 28 U.S.C. §1491(a)(1) because Alaska is suing the United States for breaching its contracts with Alaska and taking Alaska's property without paying just compensation. This Court has exclusive jurisdiction because Alaska is seeking monetary relief in an amount that exceeds $10,000.

## PARTIES

18.     Plaintiff is the State of Alaska.

19.     Defendant is the United States of America.

## FACTUAL ALLEGATIONS

### I.     The Alaska Statehood Act

20.     The United States purchased Alaska from Russia in 1867. It thereby acquired "in a single stroke 365 million acres of land—an area more than twice the size of Texas." *Sturgeon v. Frost*, 587 U.S. 28, 33 (2019) (*Sturgeon II*) (cleaned up).

21.     For the next 90 years, the Federal Government owned all of Alaska. *Id.* But Alaska's distant location and few inhabitants led to an "'era of total neglect,'" and the purchase was roundly mocked as "Seward's Folly" and President Johnson's "Polar Bear Garden." *Id.*

22.     It was not until the 1950s, after "[o]pportunities to mine, trap, and fish attracted tens of thousands more settlers," that Congress seriously considered admitting Alaska as a State. *Id.* But

there was a problem: 98 percent of the land was still owned by the Federal Government. *Sturgeon v. Frost*, 577 U.S. 424, 429 (2016) (*Sturgeon I*).

23.     As a result, "absent a land grant from the Federal Government to the State, there would be little land available to drive private economic activity and contribute to the state tax base." *Id.* Indeed, one of the principal objections to statehood was that Alaska would not survive unless it was "'heavily subsidized by the other 48 States of the Union.'" *Trustees for Alaska v. State*, 736 P.2d 324, 335 (Alaska 1987) (quoting 104 Cong. Rec. 9498 (1958)).

24.     A solution was struck. In 1958, Congress passed—and the people of Alaska ratified— the Alaska Statehood Act, making Alaska the 49th state in the Union.

25.     To "propel private industry and create a tax base," Congress made an enormous land grant to the new State. *Sturgeon II*, 587 U.S. at 34. Over the next 35 years, Alaska could select for itself more than 103 million acres of "vacant, unappropriated, and unreserved" federal land, about a quarter of all land in Alaska. Statehood Act §6(a)-(b).

26.     Importantly, the Act promised that the land grants to Alaska "shall include mineral deposits" and that the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." *Id.* §6(i).

27.     These mineral rights were essential because only a fraction of the land in Alaska was suitable for agriculture, and "the federal government had already reserved the most valuable land" for itself. *Trustees for Alaska*, 736 P.2d at 336 n.23. Given the severe challenges facing the new State, these mineral rights were seen as "'the foundation upon which Alaska'" could become a "'full and equal' State." *Id.* at 336 (quoting 104 Cong. Rec. 9361 (1958)).

28.     The Statehood Act also made clear that Alaska—not the Federal Government—would have "regulatory authority over 'navigation, fishing, and other public uses'" on the navigable waters within the State. *Sturgeon II*, 587 U.S. at 35.

29.     By incorporating the Submerged Lands Act of 1953, "the Statehood Act gave Alaska 'title to and ownership of the lands beneath navigable waters.'" *Id.* (quoting 43 U.S.C. §1311); *see* Statehood Act §6(m).

30.     In granting these powers and land rights, Congress recognized that Alaska would "'develo[p] . . . its resources by making them available for maximum use consistent with the public interest.'" *Sturgeon I*, 577 U.S. at 429 (quoting Alaska Const. art. VIII, §1).

## II.     The Cook Inlet Land Exchange

31.     The Statehood Act did not determine the rights of the Alaska Natives, who asserted aboriginal title to much of the same land now claimed by the State. *Id.*

32.     To address these issues, Congress in 1971 passed the Alaska Native Claims Settlement Act (ANCSA), which extinguished aboriginal land claims but also allowed corporations organized by Alaska Natives to select more than 40 million acres of federal land. ANCSA further directed the Secretary of Interior to withdraw up to 80 million acres of land from selection by the State to set aside for conservation purposes. 43 U.S.C. §1616(d)(2).

33.     Although the law worked well throughout much of the State, "severe difficulties arose" in the Cook Inlet region of southcentral Alaska. *State v. Lewis*, 559 P.2d 630, 633 (Alaska 1977).

34.     Much of the land desired by the new Alaska Native corporation (Cook Inlet Region, Inc. or CIRI) had already been selected by the State or set aside by the Federal Government for public purposes. *See* House Rep. 104-643, at 3-4 (June 27, 1996). The land available to CIRI under ANCSA thus was "largely comprised of mountains and glaciers, hardly the settlement contemplated by Congress." *Id.* at 4.

35.     To resolve these issues, there was a "series of intense discussions" among the United States, Alaska, CIRI, and "various other interested groups," including "mining interests." House Rep.

94-729, at 30 (Dec. 15, 1975). The United States, the State of Alaska, and CIRI ultimately signed a contract agreeing to "the largest land exchange in American history." House Rep. 104-643, at 4.

36.     Titled the "Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area," it was enacted by Congress as Public Law 94-204, an amendment to ANCSA, and subsequently approved by the Alaska legislature. *Id.* at 4-5; *see* Pub. L. 94-204, 89 Stat. 1145 (1976). The three-way agreement is now commonly known as the Cook Inlet Land Exchange.

37.     All parties stood to benefit under the Land Exchange.

38.     For the United States, the "centerpiece" of the land exchange was the creation of the Lake Clark National Park and Preserve. House Rep. 104-643, at 4. To create a contiguous park, both the State and CIRI gave their land rights to the United States and "contractually bound themselves to support [the] creation of the [park]." *Id.*

39.     Today, the park spans more than 4 million acres and is a land of stunning beauty, containing glaciers, volcanoes, forested coasts, and other distinctive Alaskan landscapes.

40.     For the State of Alaska, it gained access to and ownership of approximately 525,000 acres in the Lake Iliamna area and the Nushagak River and Koksetna River drainages of Bristol Bay. These lands had previously been withdrawn from selection by the State under ANCSA. *See* 43 U.S.C. §1616(d)(2)(A); Pub. L. 94-204, §12(d)(1).

41.     Like much of Alaska, the lands the State received in the Exchange were known to contain extensive wetlands and streams.

42.     Although most of these lands had previously been set aside by the federal government for conservation purposes, the United States opened these lands to Alaska with the full knowledge that the State would "utiliz[e]" and "develo[p]" the land "for the maximum benefit of its people." Alaska Const. art. VIII, §2.

43.     Indeed, the parties knew that the lands had significant mineral development potential, and the State wanted to explore them and ultimately to obtain economic benefit from them.

44.     The State insisted that the Land Exchange explicitly recognize its mineral rights.

45.     The new lands the State obtained were thus designated "for all purposes as if conveyed to the State under and pursuant to Section 6 of the Alaska Statehood Act." Pub. L. 94-204, §12(d)(1). That meant the State would, among other things, own the new lands' "mineral deposits" and have the right to "lease [them] as the State legislature may direct." Statehood Act §6(i).

46.     These mineral-rich lands thus would help the young State—which was still the least populated in the union despite its vast size—receive "the income that [it] needed to meet the costs of statehood." *Trustees for Alaska*, 736 P.2d at 336.

47.     In fact, some of the land was ultimately conveyed directly under the Statehood Act. Under the Land Exchange, the State was entitled to select "no more than 27 townships of land." Pub. L. 94-204, §12(d)(1). When the State later determined that it had over-designated the amount of land that could be conveyed under the Land Exchange (selecting 28.1 townships), the United States allowed the State to redesignate some of the lands to be conveyed under the Statehood Act.

## III.    The Bristol Bay Area Plan of 1984

48.     Following the Land Exchange, the State spent years developing the Bristol Bay Area Plan, a comprehensive land-use plan designating each area of land in the Bristol Bay region to its best uses, including mining, hunting, fishing, conservation, and others. The Plan was co-signed by the Commissioners for the Alaska Department of Natural Resources and the Alaska Department of Fish and Game.

49.     The State developed the plan with the goal of preserving fish and wildlife resources on the State's new lands while also allowing for the exploration and development of other resources such as oil, gas, and minerals.

7

50.     Indeed, unlike most States, Alaska is constitutionally required to protect its natural resources. The State must provide for the "conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people." Alaska Const. art. VIII, §2. Fish, wildlife, and waters are "reserved to the people for common use." *Id.* §3. And all replenishable resources belonging to the State "shall be utilized, developed, and maintained on the sustained yield principle," *id.* §4, which requires "'maximum use of natural resources with their continued availability to future generations,'" *West v. State*, 248 P.3d 689, 696 (Alaska 2010) (quoting The Alaska Const. Convention, Proposed Const. for the State of Alaska: A Report to the People of Alaska (1956)).

51.     In addition, the Alaska Department of Natural Resources ensures that any use of water is in the public interest, and the Alaska Department of Fish & Game carries out Alaska's constitutional responsibilities for maintaining a sustained yield of fish and other replenishable resources for future generations.

52.     Importantly, the Bristol Bay Area Plan designated for mineral exploration a portion of land that would later be known as the Pebble Deposit.

## IV.     The Pebble Deposit

53.     In 1987, an Alaskan geologist, Phil St. George, was piloting an airplane in a remote area of the Bristol Bay region when he made the biggest discovery of his career.

54.     Seeing rust-colored earth (an indication of gold), St. George identified the land as worthy of mineral exploration. After initial tests indicated that the land contained gold and copper, St. George named the area after Pebble Beach, the famous golf course, because his discovery felt "like getting a hole in one."

55.     Cominco Alaska, the company that employed St. George, quickly staked a mineral claim on the land.

56.     Despite its potential, the Pebble Deposit remained largely unexplored due to low metal prices and the large costs involved in any mining operation.

57.     But in 2002, after a different company acquired the mineral claim for the Pebble Deposit, significant resources were devoted to exploring the Pebble Deposit.

58.     After years of exploration and analysis, the world began to understand the Pebble Deposit's enormous potential.

59.     Located about 200 miles southwest of Anchorage and accessible only by helicopter or snowmobile, the Pebble Deposit is now recognized as the largest undeveloped copper deposit in the world.

60.     The Pebble Deposit contains an astounding 57 billion pounds of copper. It also contains copious other minerals, including 71 million ounces of gold, 3.4 billion pounds of molybdenum, 345 million ounces of silver, and 2.6 million kilograms of rhenium.

61.     In 2010, one EPA estimate of the value of the Pebble Deposit was $700 billion, or $700 million per year for 100 years.

62.     The importance of this discovery of copper and rare earth minerals cannot be overstated. Electric vehicles, solar and wind power, and batteries for energy storage all run on copper and rare earths. Because of the worldwide push to transition to renewable energy, copper demand is expected to soar in the coming years. But a lack of new mining activity will cause severe shortages of copper worldwide. Unless significant new supplies of copper become available, global climate goals will be short-circuited and remain out of reach.

63.     As the owner of the Pebble Deposit, Alaska would benefit enormously from the mining of its land.

64.     Mining the State's lands would provide the State with more than $100 million a year through state taxes, licensing fees, and royalty payments.

65.     Mining the State's lands would also create employment opportunities in a remote part of Alaska where economic development is otherwise limited. One study estimated that a mine, just in the initial capital phase, would create more than 12,000 jobs—a critical lifeline for a region that has struggled economically.

66.     Simply put, a mine on the State's lands would do exactly what was intended by the Land Exchange and the Statehood Act: It would provide the revenues necessary to support state and local governments and sustain Alaska's economy, culture, and way of life.

## V.     The EPA's Veto of the Pebble Deposit

67.     Around 2010, various environmental groups began urging the EPA to preemptively "veto" the mining of the Pebble Deposit under Section 404(c) of the Clean Water Act of 1972.

68.     A rarely used provision, Section 404(c) allows the EPA Administrator to "prohibit" or "restrict" the use of a "disposal site" for "dredged or fill material" when the discharge will "have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. §1344(c).

69.     Despite the United States' earlier promise that the Pebble Deposit "shall be subject to lease by the State as the State legislature may direct," Statehood Act §6(i); Pub. L. 94-204, §12(d)(1), the EPA in 2014 announced its intention to restrict discharges associated with mining the Pebble Deposit, *see* 79 Fed. Reg. 42314, 42317-18 (July 21, 2014).

70.     Because no permit application had been filed with the U.S. Army Corps of Engineers, *see* 33 U.S.C. §1344(a), the EPA took these preemptive steps based on notifications that the Pebble Limited Partnership (the company with mineral rights over the Pebble Deposit) filed with the Securities and Exchange Commission. 79 Fed. Reg. at 42315.

71.     PLP quickly sued, alleging, among other things, that the proposed veto violated the Cook Inlet Land Exchange and the Statehood Act.

72.     In May 2017, the EPA settled the lawsuit, agreeing to initiate a process to withdraw the Proposed Determination. The EPA officially withdrew the Proposed Determination in August 2019. 84 Fed. Reg. 45749 (Aug. 30, 2019).

73.     PLP continued to work with the State of Alaska. PLP applied for all permits and licenses necessary from Alaska at each stage of the development work. Although PLP has received many of the necessary approvals from State agencies, processing of some of these permits has been precluded by the EPA's preemptive veto. Indeed, it was premature for the EPA to act before the State's administrative process had concluded.

74.     In June 2020, after years of discussions with the Corps and the EPA, PLP submitted a permit application with the Corps to develop the Pebble Deposit.

75.     PLP's application acknowledged that wetlands were present throughout the Pebble Project area, including the mine site. Because the Corps asserted jurisdiction over wetlands as "waters of the United States" under the Clean Water Act, discharges into regulated waters were unavoidable.

76.     But, as the Corps would later confirm, the proposed removal of wetlands would not have a measurable effect on fish. And while the footprint of the mine would encompass streams and other waters, this loss of habitat was not expected to have a measurable impact on fish populations. In fact, less than 0.01% of the streams in Bristol Bay would have been adversely affected by the proposed project.

77.     Consistent with the public interest, PLP promised to take numerous measures to avoid and minimize impacts to wetlands and other waters, air quality, wildlife and aquatic habitat, areas of cultural significance, and areas of known subsistence use. For example, PLP would contain and treat water on the mine site, construct over waters only where necessary, and design the project to cause the least possible impact. PLP would also, as required by state law, construct all necessary fishways to

ensure proper protection of anadromous fish. PLP further agreed to undertake extensive reclamation efforts to restore the area after mining was completed.

78.     In July 2020, the Army Corps published its final environmental impact statement, which concluded that the Pebble mine, as proposed by PLP in its application, would have no "measurable impact on fish populations." The EIS also noted the positive economic effects that a Pebble mine would have for southwestern Alaska.

79.     Despite its environmental impact statement finding that the project plan would adequately protect fisheries, the Corps initially denied PLP's application. *See* Pebble Project EIS, U.S. Army Corps of Eng'rs, bit.ly/3JIedOE. The decision was later reversed on appeal for failing to adequately explain the denial, and the application remains pending with the Corps. *See* Administrative Appeal Decision, U.S. Army Corps of Eng'rs, POA-2017-271 (Apr. 24, 2023), bit.ly/3pT7ryO.

80.     In October 2021, a district court granted a motion from the EPA to vacate the agency's 2019 decision withdrawing the 2014 proposed determination.

81.     On January 30, 2023, over strong objections from the State of Alaska, the EPA announced its final veto over the Pebble Deposit. *See* Final Determination, U.S. EPA (Jan. 2023), bit.ly/3ofUIFM; *see also* 88 Fed. Reg. 7441 (Feb. 3, 2023).

82.     Pointing to an expected loss of wetlands and streams, the EPA concluded that the mine would lead to "unacceptable adverse effects on anadromous fishery areas." Final Determination at Exec. Summary, 15-16.

83.     The EPA therefore issued a "prohibition" over the Pebble Deposit (a 24.7 square mile area), which prohibited the planned discharge of dredged or fill material for the construction and operation of the mine, as well as any similar "future proposals." *Id.*

84.     The EPA, however, went even further, concluding that the types of discharges proposed would have "unacceptable adverse effects" if done "anywhere" within the surrounding region. *Id.* at 16.

85.     The EPA thus issued a new "restriction" on any similar level of discharges over a 309-square-mile area of land, encompassing the Pebble Deposit and covering a land area exponentially larger than the size of the proposed project. *Id.*

86.     The Final Determination thus effectively prevents any mining from ever occurring on the Pebble Deposit and the surrounding area.

## VI.     The Effect of the Final Determination on the State of Alaska

87.     Since it became a State, Alaska has depended heavily on its State-owned lands to obtain the resources necessary to fund the State and local governments and provide for its citizenry.

88.     Alaska remains sparsely populated and often inaccessible except by plane, boat, or snowmobile. To put it in perspective, if the District of Columbia contained the same population density as Alaska, only *75 people* would live in the entire District.

89.     No land-use project in recent memory was more important to the State than the Pebble Deposit. It would have generated billions of dollars in revenue for the State and tens of thousands of jobs for Alaskans, many of whom are rural residents with limited economic opportunities. And it would have produced essential mineral resources for the emerging energy market, positioning Alaska as a leader in the coming renewable energy transition.

90.     Alaska received the Pebble Deposit and the other restricted lands with the express understanding that the State would be able to lease them to mining companies that would pay taxes and royalties to financially support the State. Indeed, the State relinquished its own land rights to obtain the property, expecting that it would be a long-term financial investment.

91.     But the Final Determination effectively prevents any mining from ever occurring on the Pebble Deposit and the surrounding area.

92.     The Final Determination wipes away all the value of the Pebble Deposit and the other lands covered by the EPA's restriction.

93.     The lands at issue are undeveloped and not served by any transportation or utility infrastructure, and they are accessible only by helicopter or snowmobile. The closest communities are the villages of Iliamna, Newhalen, and Nondalton, each of which is about 17 miles from the deposit. And the nearest village (Nondalton) has only about 130 residents.

94.     Due to Alaska's climate and barren landscape, these lands cannot support crops, timber, or other agricultural uses.

95.     Simply put, there is *nothing* the State can do with these lands for economic purposes because of the Final Determination.

96.     By making it impossible for the State to utilize the lands' mineral resources, the United States has effectively confiscated the land and created a *de facto* national park.

### CLAIMS FOR RELIEF
### COUNT I
### Breach of Contract

97.     Plaintiff incorporates all prior allegations.

98.     The Cook Inlet Land Exchange and the Alaska Statehood Act are binding, enforceable contracts. *See McGee v. Mathis*, 71 U.S. 143, 155 (1866); *Andrus v. Utah*, 446 U.S. 500, 507 (1980).

99.     Per these agreements, the United States promised that the land Alaska was receiving "shall include mineral deposits" and that the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." Statehood Act §6(i); Land Exchange §12(d)(1).

100.    The State still owns these lands, which include the Pebble Deposit and the surrounding areas, and has long designated these lands for mineral exploration.

101. Under the proposed mine, the State anticipated receiving more than $100 million a year in state taxes, licensing fees, and royalty payments.

102. But Defendant breached its agreements with the State through the Final Determination, which effectively prevents any mining from ever occurring on the Pebble Deposit and the surrounding area.

103. Because the United States has breached the Cook Inlet Land Exchange and the Statehood Act, the State of Alaska is entitled to monetary damages in an amount to be determined at trial that exceeds $100 million per year of the breach.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing

104. Plaintiff incorporates all prior allegations.

105. Every contract, including the Cook Inlet Land Exchange and the Statehood Act, includes an implied covenant of good faith and fair dealing.

106. The covenant of good faith and fair dealing "prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014).

107. The Cook Inlet Land Exchange and the Alaska Statehood Act are binding, enforceable contracts. *See McGee*, 71 U.S. at 155; *Andrus*, 446 U.S. at 507.

108. Per these agreements, the United States promised that the land Alaska was receiving "shall include mineral deposits" and that the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." Statehood Act §6(i); Land Exchange §12(d)(1).

109. The State still owns these lands, which include the Pebble Deposit and the surrounding areas, and has long designated them for mineral exploration.

110.     Under the proposed mine, the State anticipated receiving more than $100 million a year in state taxes, licensing fees, and royalty payments.

111.     But Defendant breached its agreements with the State through the Final Determination by effectively preventing any mining from ever occurring on the Pebble Deposit and the surrounding area.

112.     Defendant violated the covenant of good faith and fair dealing by "act[ing] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed Cir. 2005) (citing Restatement (Second) of Contracts §205).

113.     Because the United States has breached the covenant of good faith and fair dealing in the Cook Inlet Land Exchange and the Statehood Act, the State of Alaska is entitled to monetary damages in an amount to be determined at trial that exceeds $100 million per year of the breach.

## COUNT III
## Permanent Categorical Taking

114.     Plaintiff incorporates all its prior allegations.

115.     The Fifth Amendment of the United States bars the United States from taking property "for public use, without just compensation."

116.     The Takings Clause "'preserve[s] freedom'" and empowers property owners (like the State of Alaska) "'to shape and to plan their own destiny in a world where'" the federal government is "'always eager to do so for them.'" *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021).

117.     A categorical taking occurs when a regulation "'compel[s] the property owner to suffer a physical invasion of its property' or prohibit[s] 'all economically beneficial or productive use.'" *Dimare Fresh v. United States*, 808 F.3d 1301, 1307 (Fed Cir. 2015) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)).

118.    The State owns the lands regulated by the Final Determination, including the Pebble Deposit and the surrounding area, and has long designated these lands for mineral exploration.

119.    Under the proposed mine, the State anticipated receiving more than $100 million a year in state taxes, licensing fees, and royalty payments.

120.    The Final Determination, however, effectively prevents any mining from ever occurring on the State's lands.

121.    But mining is the only economically productive use of these lands.

122.    These lands are isolated from civilization, with the closest villages being about 17 miles away. They have no transportation or utility infrastructure and are accessible only by helicopter or snowmobile. No crops or agricultural uses are feasible because of the climate and barren landscape.

123.    The Final Determination constitutes a categorical taking because it prohibits all economically beneficial and productive use of the State's lands.

124.    The taking was completed by the issuance of the Final Determination. Alternatively, the taking was effectuated by the Army Corps's refusal to issue a permit.

125.    Because Defendant has taken the State of Alaska's property, the State is entitled to just compensation in an amount to be determined at trial that exceeds $700 billion.

## COUNT IV
## Permanent Non-Categorical Taking

126.    Plaintiff incorporates all its prior allegations.

127.    Even if property can be regulated, "if regulation goes too far it will be recognized as a taking." *Penn Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

128.    The State owns the lands regulated by the Final Determination, including the Pebble Deposit and the surrounding area, and has long designated these lands for mineral exploration.

129.    Under the proposed mine, the State anticipated receiving more than $100 million a year in state taxes, licensing fees, and royalty payments.

130.    The Final Determination, however, effectively prevents any mining from ever occurring on the State's lands.

131.    The Final Determination is a non-categorical taking because its regulation of the State's lands "goes too far." *Id.*

132.    The "economic impact of the regulation" is enormous, as the State will lose billions of dollars in taxes, licensing fees, and royalty payments. *Cedar Point Nursery*, 594 U.S. at 148.

133.    The Final Determination interferes with the State's "reasonable investment-backed expectations" that these lands would be subject to mineral leasing. *Id.*

134.    And the Final Determination "'forc[es] [the State] alone to bear public burdens which, in all fairness and justice, should be borne by the [American] public as a whole.'" *Lingle*, 544 U.S. at 537.

135.    The taking was completed by the issuance of the Final Determination. Alternatively, the taking was effectuated by the Army Corps's refusal to issue a permit.

136.    Because Defendant has taken the State of Alaska's property, the State is entitled to just compensation in an amount to be determined at trial that exceeds $700 billion.

## COUNT V
## Temporary Taking

137.    Plaintiff incorporates all its prior allegations.

138.    Even if the EPA were to withdraw its Final Determination, or if a court were to vacate the Final Determination, the Final Determination, so long as it is in force, blocks the Army Corps from issuing a Clean Water Act permit for the Pebble mine.

139.    So long as the Final Determination remains in force, it constitutes at least a temporary taking of the State's property, categorically or at least partially.

140.    Because Defendant has taken the State of Alaska's property at least temporarily, the State is entitled to just compensation in an amount to be determined at trial that exceeds $10,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court order the following relief:

a.   Enter judgment in favor of Plaintiff and against Defendant on all of Plaintiffs' claims;

b.   Award damages for Defendant's breach of contract and breach of the covenant of good faith and fair dealing in an amount to be determined at trial but which exceeds $100 million per year of the breach;

c.   Award just compensation for Defendant's taking of the State's property in an amount to be determined at trial but which exceeds $700 billion;

d.   Award pre-judgment and post-judgment interest as permitted by law;

e.   Award costs and reasonable attorney's fees; and

f.   Grant any other relief available at law or equity that is just and proper.

Respectfully submitted,

Dated: March 14, 2024           */s/ J. Michael Connolly*

J. Michael Connolly
    *Counsel of Record*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Of Counsel*

TREG TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl (*pro hac vice application forthcoming*)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
(907) 269-5232
ron.opsahl@alaska.gov

Steven Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
steven@consovoymccarthy.com

*Counsel for Plaintiff the State of Alaska*