# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STATE OF ALASKA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 24-396L<br><br>Judge Richard A. Hertling |

# THE UNITED STATES' MOTION TO DISMISS

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRIAN R. HERMAN
Assistant Section Chief
United States Department of Justice
Energy & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 532-3278
Brian.Herman@usdoj.gov

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Bristol Bay Watershed ........ 2

II. The Pebble Deposit ........ 4

III. The Alaska Statehood Act, Alaska Native Claims Settlement Act, and the Cook Inlet Land Exchange ........ 4

IV. The Clean Water Act ........ 6

V. Recent Events Relating to the Pebble Deposit ........ 7

VI. Litigation Over the Final Determination ........ 12

ARGUMENT ........ 13

I. The Court Should Dismiss Alaska's Complaint Because the Court Lacks Subject Matter Jurisdiction. ........ 13

A. The Tucker Act's Waiver of Sovereign Immunity is Limited by 28 U.S.C. § 1500. ........ 14

B. Under § 1500, the Court is Divested of Jurisdiction When a Claim Based on the Same Operative Facts is Pending in Another Court Regardless of When It Was Filed. ........ 16

C. Congressional Intent and Precedent Support This Plain Reading of § 1500 ........ 18

D. Alaska's CFC Complaint is Based on the Same Operative Facts as Its District Court Complaint. ........ 23

II. The Court of Claims' *Tecon* Decision Does Not Mandate a Different Result. ........ 24

A. *Tecon* is Distinguishable. ........ 24

B. *Tecon* was Wrongly Decided and, Following *Tohono*, the Court Should Dismiss the State's Complaint. ........ 26

CONCLUSION ........ 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska v. United States*,
35 Fed. Cl. 685 (1996) ........ 5

*Aldinger v. Howard*,
427 U.S. 1 (1976) ........ 27

*Alvarez v. Smith*,
558 U.S. 87 (2009) ........ 19

*Arrowood Indem. Co. v. United States*,
148 Fed. Cl. 299 (2020) ........ 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 4

*Beers v. Arkansas*,
61 U.S. 527 (1858) ........ 15, 16

*Blue Cross and Blue Shield of Kan. City Welfare Benefit Plan v. United States*,
173 Fed. Cl. 132 (2024) ........ 31

*Brandt v. United States*,
710 F.3d 1369 (Fed. Cir. 2013) ........ 16, 19, 28

*Chertkov v. Off. of Pers. Mgmt.*,
52 F.3d 961 (Fed. Cir. 1995) ........ 27

*Confidential Informant 59-05071 v. United States*,
134 Fed. Cl. 698 (2017) ........ 3

*Def. Council, Inc. v. Nuclear Regul. Comm'n*,
216 F.3d 1180 (D.C. Cir. 2000) ........ 30

*Dep't of the Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) ........ 15, 16, 27

*Glidden Co. v. Zdanok*,
370 U.S. 530 (1962) ........ 15, 25

*Gospel Lighthouse Church, Inc. v. City of Dallas*,
999 F.2d 1580 (5th Cir. 1993) ........ 19

*Hobbs v. United States*,
168 Ct. Cl. 646 (1964) ........ 21, 27

*In re Skinner & Eddy Corp.*,
265 U.S. 86 (1924) ........ 21, 22

*Ins. Co. of the W. v. United States*,
243 F.3d 1367 (Fed. Cir. 2001) ........ 30

*Iowa Prot. and Advoc. Servs. v. Tanager, Inc.*,
427 F.3d 541 (8th Cir. 2005) ........ 19

*Keene Corp. v. United States*,
508 U.S. 200 (1993) ........ 19, 22

*Loveladies Harbor, Inc. v. United States*,
27 F.3d 1545 (Fed. Cir. 1994) ........ 28

*Maguire Industries v. United States*,
114 Ct. Cl. 687 (1949)........ 20, 21

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) ........ 31

*Nat'l Inst. of Health v. Am. Public Health Assoc.*,
606 U.S. __, 145 S. Ct. 2658 (2025) ........ 30

*OPM v. Richmond*,
496 U.S. 414 (1990) ........ 16

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014) ........ 16

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ........ 30

*Res. Investments, Inc. v. United States*,
785 F.3d 660 (Fed. Cir. 2015) ........ 30

*Stone Container Corp. v. United States*,
229 F.3d 1345 (Fed. Cir. 2000) ........ 30

*Sturgeon v. Frost*,
577 U.S. 424 (2016) ........ 5

*Sturgeon v. Frost*,
587 U.S. 28 (2019) ........ 4, 5

*Tecon Engineers, Inc. v. United States*,
343 F.2d 943 (Ct. Cl. 1965) ........ passim

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ........ 2

*Tohono O'Odham Nation v. United States*,
559 F.3d 1284 (Fed. Cir. 2009) ........ 29

*Troy v. Samson Mfg. Corp.*,
758 F.3d 1322 (Fed. Cir. 2014) ........ 31

*United States v. Mitchell*,
463 U.S. 206 (1983) ........ 14

*United States v. Tohono O'Odham Nation*,
563 U.S. 307 (2011) ........ passim

*UNR Indus., Inc. v. United States*,
962 F.2d 1013 (Fed. Cir. 1992) ........ passim

*Williams v. United States*,
289 U.S. 553 (1933) ........ 15

**Statutes**

28 U.S.C. § 1346 ........ 25

28 U.S.C. § 1500 ........ passim

33 U.S.C. § 1311(a) ........ 6

33 U.S.C. § 1311(f) ........ 6

33 U.S.C. § 1344(b) ........ 6

33 U.S.C. § 1344(c) ........ 7

Pub. L. No. 85-508 72 Stat. 339 (1958) ........ 5

Pub. L. No. 92-203, 85 Stat. 688 (1971) ........ 5

Pub. L. No. 92-500, 86 Stat. 81 (1972). ........ 6, 7, 8, 9

Pub. L. No. 94-204, 89 Stat. 1145 (1976) ........ 6

**Other Authorities**

Antonin Scalia,The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175 (1989) 31

H.R. Rep. No. 104-643 (1996) ........ 5

H.R. Rep. No. 80-30 (1947) ........ 22

## INTRODUCTION

The Pebble deposit is a mineral deposit in southwest Alaska. It underlies streams, wetlands, and other waters that are critical for supporting salmon in parts of Alaska's Bristol Bay watershed, a largely undisturbed, globally significant economic, ecological, and cultural resource.

The plaintiff, the State of Alaska, owns the land where the Pebble deposit is located, along with the mineral rights. Pebble Limited Partnership ("PLP"), through affiliated entities, holds mining claims to the Pebble deposit from the State. As part of efforts to mine the Pebble deposit, PLP sought a permit under Section 404 of the Clean Water Act ("CWA") from the U.S. Army Corps of Engineers. It sought permission to discharge dredged or fill material from its planned mine into waters of the United States. The Corps initially denied PLP's permit application, but PLP administratively appealed. While the Corps' administrative appeal process was ongoing, the U.S. Environmental Protection Agency issued a final determination under Section 404(c) of the CWA to prohibit and restrict certain discharges in waters of the United States ("Final Determination").

Alaska has sued the United States over the EPA's Final Determination. The State alleges that the EPA's actions breached contracts, violated the covenant of good faith and fair dealing, and took Alaska's property. But this Court lacks subject matter jurisdiction. Congress has curtailed the Court of Federal Claims' jurisdiction when claims based on similar facts are pending elsewhere. This condition on the United States' waiver of sovereign immunity is older than the Tucker Act itself.

Currently codified at 28 U.S.C. § 1500, it provides that the "Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . has pending in any other court any suit or process against the United States."

Alaska's complaint collides with § 1500's restriction. It sued the United States here, alleging contract and takings claims based on the EPA's Final Determination. But a few weeks later, Alaska sued the EPA in the United States District Court for the District of Alaska under the Administrative Procedure Act. Alaska has asked that court to hold unlawful and to set aside the EPA's Final Determination. That case is pending. Alaska therefore has pending claims in another court based on the same operative facts as this case: the EPA's issuance of the Final Determination. This Court lacks subject matter jurisdiction.

## BACKGROUND

### I. Bristol Bay Watershed

Bristol Bay is in southwest Alaska. Environmental Protection Agency, *Final Determination of the U.S. Environmental Protection Agency Pursuant to Section 404(c) of the Clean Water Act, Pebble Deposit Area, Southwest Alaska* ("Final Determination") at ES-2 (Jan. 2023), https://www.epa.gov/system/files/documents/2023-01/Pebble-Deposit-Area-404c-FD-Jan2023.pdf.[1] The Bristol Bay watershed has

[1] In considering a motion to dismiss, the Court can consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Alaska discusses and relies on the Final Determination throughout its complaint (Cont'd)

abundant, high quality, and diverse freshwater habitats, including rivers, streams, wetlands, and other aquatic resources. *See id.* at 3-3–3-4. It is of great ecological value, with unrivaled salmon diversity and productivity. *Id.* at ES-1. The Bristol Bay watershed "provides intact, connected habitats—from headwaters to ocean—that support abundant, genetically diverse wild Pacific salmon populations." *Id.*

The salmon resources of the Bristol Bay area "have supported Alaska Native cultures for thousands of years and continue to support one of the last intact salmon-based cultures in the world." *Id.* They also support "world-class, economically important, commercial and sport fisheries for salmon and other fishes." *Id.* For instance, "[t]he Bristol Bay watershed . . . produc[es] approximately half of the world's Sockeye Salmon." *Id.* "Bristol Bay is . . . one of the last places on Earth with such bountiful and sustainable harvests of wild salmon." *Id.* This is mainly because Bristol Bay's watershed is "largely untouched and pristine." *Id.*

These resources have value beyond the Bristol Bay area. In 2019, the total economic value of the area's salmon resources was estimated to be more than $2.2 billion. *Id.* at ES-3. Bristol Bay's commercial salmon fishery contributed $2 billion of that amount and supports 15,000 jobs. *Id.*

---

and has therefore incorporated it into the complaint. *See, e.g.*, Compl. ¶¶ 81–96, Dkt. No. 1. The Court can also take judicial notice of the Final Determination because it is a publicly available government record. *See Arrowood Indem. Co. v. United States*, 148 Fed. Cl. 299, 311 n.7 (2020), *aff'd sub nom. Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022); *see also Confidential Informant 59-05071 v. United States*, 134 Fed. Cl. 698, 721 (2017).

## II. The Pebble Deposit

The Pebble deposit is a large, low-grade deposit of minerals "located at the headwaters of the pristine Bristol Bay watershed." *Id.* It is about 200 miles southwest of Anchorage. Compl. ¶ 59. The deposit "underlies portions of the South Fork Koktuli River (SFK), North Fork Koktuli River (NFK), and Upper Talarik Creek (UTC) watersheds, which drain to two of the largest rivers in the Bristol Bay watershed, the Nushagak and Kvichak Rivers." Final Determination at ES-3; *see also id.* at ES-4.

The Pebble deposit contains copper, gold, molybdenum, silver, and rhenium. Compl. ¶ 60.[2] The deposit was first explored beginning in the 1980s. Final Determination at 2-8. Beginning in the early 2000s, mineral claims for the deposit changed hands and significant exploration of the Pebble deposit began. Compl. ¶ 57; *see also* Final Determination at 2-8.

## III. The Alaska Statehood Act, Alaska Native Claims Settlement Act, and the Cook Inlet Land Exchange

In 1867, the United States bought Alaska from Russia. Compl. ¶ 20; *see also Sturgeon v. Frost*, 587 U.S. 28, 33 (2019) ("*Sturgeon II*"). By the 1950s, those living in Alaska sought admission to the Union. *Sturgeon II*, 587 U.S. at 34. As Congress considered admission, one concern was how, with such a vast territory but small population, the future state might raise the revenue necessary to function. *See*

---

[2] For purposes of this motion to dismiss only, the United States assumes the allegations in the complaint to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citations omitted).

*Alaska v. United States*, 35 Fed. Cl. 685, 688–95 (1996), *aff'd*, 119 F.3d 16 (Fed. Cir. 1997); *see also Sturgeon II*, 587 U.S. at 34.

Congress addressed this in the Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339 (1958). The Statehood Act allowed Alaska to select for itself 103 million acres of "vacant, unappropriated, and unreserved" federal lands. *Sturgeon II*, 587 U.S. at 34; *see also* Statehood Act §§ 6(a)–(b), 72 Stat. at 340. This land grant included mineral rights. Statehood Act § 6(i), 72 Stat. at 342; *see also Sturgeon v. Frost*, 577 U.S. 424, 429 (2016) ("*Sturgeon I*"). The Act also provided that "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." Statehood Act § 6(i), 72 Stat. at 342.

The Statehood Act did not, however, address Alaska Natives' claims to much of the land Alaska could select under the Statehood Act. *See Sturgeon I*, 577 U.S. at 429. To resolve this dispute, Congress passed the Alaska Native Claims Settlement Act ("ANCSA"), Pub. L. No. 92-203, 85 Stat. 688 (1971). *See id.* at 429–30. Congress extinguished aboriginal land claims in Alaska but provided, among other things, for Alaska Natives to organize corporations that would be entitled to select 40 million acres to manage. *Id.* at 430.

ANCSA did not resolve disputes around Cook Inlet. Much of the land in the Cook Inlet region had been selected by Alaska. *See* H.R. Rep. No. 104-643 at 3 (1996). Other lands had been withdrawn by the United States. *Id.* As a result, "there were extreme difficulties . . . in adequately fulfilling the land entitlements of the Cook Inlet region and the villages within [it]." *Id.* at 3. So, the United States

established a land exchange involving the federal government, Alaska, and Cook Inlet Region, Inc., an Alaska Native regional corporation. *See* Pub. L. No. 94-204 § 12, 89 Stat. 1145 (1976). As part of the exchange, Alaska would select lands that the United States would then convey to it. *See id.* § 12(d). Land exchanged through this process would be "regarded for all purposes as if conveyed to the State under and pursuant to Section 6 of the Alaska Statehood Act." *Id.* § 12(d)(1). Section 6 of the Statehood Act, as noted, included the conveyance of mineral rights. Alaska alleges that the United States conveyed to it the land comprising the Pebble deposit through both this exchange and under the Statehood Act itself. *See* Compl. ¶¶ 1, 3, 6–7, 47.

**IV. The Clean Water Act**

Congress passed the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Pub. L. No. 92-500, § 101(a), 86 Stat. 816, 816 (1972). The CWA prohibits the "discharge of any pollutant" into "navigable waters," except as otherwise permitted under the Act. 33 U.S.C. § 1311(a), (f). Pollutants under the CWA include "dredged spoil . . . rock [and] sand," along with "industrial . . . waste." *Id.* § 1362(6). "Navigable waters" are "the waters of the United States." *Id.* § 1362(7).

Under Section 404(a) of the CWA, the U.S. Army Corps of Engineers can issue permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites." *See id.* § 1344(a). Section 404(b) requires the Corps to specify disposal sites for each permit issued under Section 404(a). *Id.* § 1344(b). But

the Corps' authority to specify disposal sites under Section 404(b) is expressly subject to the EPA's authority under Section 404(c):

> The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on . . . fishery areas (including spawning and breeding areas) . . . .

*Id.* § 1344(c).

## V. Recent Events Relating to the Pebble Deposit

In the early 2000s, PLP obtained mining claims to the Pebble deposit and began exploration. *See* Final Determination at ES-5; Compl. ¶¶ 57, 70. In 2004, PLP and its parent, Northern Dynasty Minerals, Ltd., began meeting with both the Corps of Engineers and the EPA about developing a mine at the Pebble deposit. Final Determination at 2-8–2-9. They also formed different working groups consisting of state and federal agencies, including the EPA, to coordinate on environmental study, review, and permitting. *Id.* at 2-9.

In 2010, tribal governments, Alaska Native corporations, and other groups asked the EPA to use its CWA § 404(c) authority to protect the Bristol Bay area from the possible effects of mining, including from a potential Pebble mine. *Id.* at ES-9. EPA also received requests that it refrain from taking any action under § 404(c), including from other tribal organizations. *See id.* at 2-10.

In response to the competing sets of requests, the EPA conducted an ecological risk assessment, which it completed in January 2014. *Id.* at ES-9, 2-10.

Following that assessment, and based on scientific and technical information then available, the EPA began a review of the potential effects of certain discharges of dredged or fill material associated with possible mining of the Pebble deposit under the EPA's § 404(c) regulations. *Id.* at 2-10–2-12. In July 2014, the EPA published a proposed determination under § 404(c) "to restrict the use of certain waters in the SFK, NFK, and UTC watersheds as disposal sites for dredged or fill material associated with mining the Pebble deposit." *Id.* at ES-9, 2-13.

PLP then sued. In May 2017, the parties settled. *Id.* at ES-9. The EPA agreed, among other things, to begin a process to propose withdrawing the 2014 proposed determination. *Id.* In 2019, the EPA withdrew the 2014 proposed determination. *Id.* at ES-9, 2-16. It did so without "basing its decision-making on technical consideration or judgments about whether the mine proposal [would] ultimately be found to meet the requirements of the 404(b)(1) Guidelines or result[] in 'unacceptable adverse effects' under CWA section 404(c).'" *Id.* at 2-16 (citing 84 Fed. Reg. 45749-01, 45756 (Aug. 30, 2019)). The EPA's withdrawal decision also identified "possible future decision-making regarding its section 404(c) authority." 84 Fed. Reg. at 45753, 45755.

Several groups then sued the EPA over its withdrawal. Final Determination at ES-9. Ultimately, a district court vacated the EPA's withdrawal of the 2014 proposed determination and remanded to the agency. *Id.*

Meanwhile, in 2017, PLP applied to the Corps for a permit under § 404 of the CWA. *Id.* at ES-5. The Corps began review in compliance with, among other things,

the National Environmental Policy Act. *Id.* at 2-1. The EPA participated in the Corps' review, submitting written comments and recommendations. *Id.* at 2-15–2-16. During that process, PLP revised its application, submitting a final revision in June 2020 (the "2020 Mine Plan"). *Id.* at 2-1.

The Corps published a final Environmental Impact Statement for the proposed Pebble mine and, in November 2020, issued a decision denying PLP's § 404 permit application. *Id.* at 2-17. The Corps denied a permit because the plan "would not comply with the CWA Section 404(b)(1) Guidelines and would be contrary to the public interest." *Id.* The Corps explained that "the proposed project would cause unavoidable adverse impacts to aquatic resources which would result in Significant Degradation to aquatic resources." *Id.* (citation omitted).

PLP administratively appealed the Corps' decision. *Id.*; *see also* Compl. ¶ 79. The Corps' Pacific Ocean Division remanded the permit decision to its Alaska District. Administrative Appeal Decision, *Pebble Limited Partnership*, POA-2017-00271 (Apr. 24, 2023), https://perma.cc/E7NX-WE9S. The Corps' remand was narrow: it found limited merit in only a handful of PLP's arguments, rejecting most others.[3] *Id.* at 2–3, 7–25, 62, 65–67.

In January 2022, while PLP's administrative appeal was pending before the Corps, the EPA began a § 404(c) process to review discharges associated with mining the Pebble deposit based on the 2020 Mine Plan. *See* Final Determination at

[3] For example, the Corps' Pacific Ocean Division affirmed the District's significant degradation finding, while remanding to clarify the area analyzed for impacts. Appeal Decision at 7–9, 10–20, 21–25.

2-18. In January 2023, it issued the Final Determination. *See id.* at ES-10–ES-14; *see also* Compl. ¶ 81. In the Final Determination, the EPA concluded that certain discharges into waters of the United States proposed in the 2020 Mine Plan would result in significant aquatic resource losses and streamflow changes. Final Determination at 5-1–5-2. It listed those as:

(1) The loss of approximately 8.5 miles of anadromous fish streams;

(2) The loss of approximately 91 miles of additional streams that support anadromous fish streams;

(3) The loss of approximately 2,108 acres of wetlands and other waters that support anadromous fish streams; and

(4) Adverse impacts on approximately 29 additional miles of anadromous fish streams resulting from greater than 20% changes in average monthly streamflow.

*Id.* at 5-2.

The EPA determined that the losses and streamflow changes would independently have "unacceptable adverse effects" on anadromous fishery areas in the South Fork Koktuli River and North Fork Koktuli River watersheds. *See id.* The EPA also determined that small changes to the location of the discharges that resulted in the same levels of loss or streamflow changes as the 2020 Mine Plan would have unacceptable adverse effects on anadromous fishery areas. *Id.* at 5-2 & n.95.

To prevent those unacceptable adverse effects, the EPA prohibited the specification of waters of the United States, within a defined area, as disposal sites for discharges of dredged or fill material for "the construction and routine operation of the 2020 Mine Plan." *Id.* at 5-2. The prohibition also extends to future proposals to construct and operate a mine to develop the Pebble deposit within the defined area that would result in the same or greater level of loss and streamflow changes as the 2020 Mine Plan. *Id.*

Based on its many years of study, the EPA also evaluated effects like those resulting from the 2020 Mine Plan within the relevant watersheds but beyond the areas around the 2020 Mine Plan footprint, because of possible relocation of discharges. *Id.* at ES-14, ES-21–ES-22. Based on its resulting unacceptable adverse effects determinations, the EPA included a restriction in the Final Determination that applies to a larger defined area. *Id.* at ES-16, ES-19. Future proposals to discharge into waters of the United States that result in any one of the above-listed resource losses or streamflow changes that the 2020 Mine Plan would cause are subject to the restriction. *Id.* at 5-12.

The Final Determination thus prohibits and restricts discharges of fill material into waters of the United States associated with developing the Pebble deposit, and only those discharges that result in levels of aquatic resource loss or streamflow changes that the EPA found unacceptable. *Id.* at ES-22–ES-23. It does not prohibit mining of the Pebble deposit or limit discharges from any other activity

in the Bristol Bay region, including into waters that are not "waters of the United States." *See id.* at ES-15–ES-16.

On April 15, 2024, following remand from the Corps' Pacific Ocean Division, the Corps' Alaska District denied PLP's permit application because of the EPA's Final Determination. U.S. Army Corps of Engineers, Alaska District, *Notification of Appeal Remand Decision for Pebble Limited Partnership's Application* (2024), https://perma.cc/8LAT-LTGB.

## VI. Litigation Over the Final Determination

On March 14, 2024, Alaska filed this case in the Court of Federal Claims ("CFC"). Dkt. No. 1. It sues because of the EPA's Final Determination. *See, e.g.*, Compl. ¶¶ 9, 12, 14. Alaska brings five counts: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) a permanent, categorial takings claim; (4) a permanent, non-categorical takings claim; and (5) a temporary takings claim. *Id.* at 14–18.

As to Count I, Alaska alleges that both the Cook Inlet Land Exchange and the Alaska Statehood Act are contracts that the United States has breached. It asserts that the Final Determination "effectively prevents any mining from ever occurring on the Pebble Deposit and the surrounding area." *Id.* ¶¶ 98, 102. In Count II, Alaska does not identify any separate government action, but says that because the Final Determination "effectively prevent[s] any mining," the United States has also breached the covenant of good faith and fair dealing. *See id.* ¶¶ 111–13. In Count III, Alaska alleges that "[t]he Final Determination constitutes a categorical

taking because it prohibits all economically beneficial and productive use of the State's lands." *Id.* ¶ 123. Alternatively, in Count IV, Alaska alleges that the EPA's Final Determination is a permanent taking of its property because it is a "regulation of the State's lands [that] goes too far." *Id.* ¶ 131 (citation modified). Lastly, Alaska alleges in Count V that if the EPA withdraws the Final Determination or if a court vacates it, there has still been a temporary taking of its property. *See id.* ¶¶ 138–39.

On April 11, 2024, a few weeks after filing its complaint in this Court, Alaska sued the EPA in the United States District Court for the District of Alaska. *See* Compl., *Alaska v. U.S. Env't Prot. Agency*, No. 3:24-cv-84 (D. Alaska Apr. 11, 2024), Dkt. No. 1 ("APA Compl.") (attached as Ex. A). Alaska's district court case challenges the EPA's Final Determination. *Id.* ¶¶ 1–9. Alaska pleads several counts and requests that the district court "[f]ind and declare that EPA violated the CWA and the [Administrative Procedure Act ("APA")] in issuing the Final Determination" and that it "[h]old unlawful and set aside the Final Determination." *Id.* at 43. Alaska's APA challenge to the EPA's Final Determination is ongoing. *See generally* Docket, *Alaska v. EPA*, No. 3:24-cv-84 (D. Alaska); *see also* Docket, *N. Dynasty Minerals Ltd. v. EPA*, No. 3:24-cv-59 (D. Alaska).

## ARGUMENT

### I. The Court Should Dismiss Alaska's Complaint Because the Court Lacks Subject Matter Jurisdiction.

Alaska has another suit pending based on the same operative facts as this case: its district court suit against the EPA challenging the Final Determination.

Because that case is pending, this Court lacks subject matter jurisdiction over Alaska's contract and takings claims. The Court should dismiss Alaska's complaint. While the Federal Circuit views its relevant precedent on Section 1500—*Tecon Engineers*—as still good law, this case is distinguishable and, in any event, the plain language of Section 1500 should lead to dismissal. *See Tecon Engineers, Inc. v. United States,* 343 F.2d 943 (Ct. Cl. 1965).

### A. <u>**The Tucker Act's Waiver of Sovereign Immunity is Limited by 28 U.S.C. § 1500.**</u>

For the first seven decades after ratification of the Constitution, anyone with a monetary claim against the United States needed to petition Congress for a private bill. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983). But in 1855, Congress created the Court of Claims. *Id.* at 212–13. At first, that court had power only to hear claims, report its findings to Congress, and make recommendations for private bills when appropriate. *Id.* at 213. In 1861, however, President Lincoln asked Congress to give the court authority to render final judgments. *Id.* In 1863, Congress did so. *Id.* In 1866, Congress removed a limitation on the court's judgment authority that had allowed the Secretary of the Treasury to exercise a revisory authority over the court's judgments. *See id.* at 213 n.12. And about two decades later, Congress passed the general waiver of sovereign immunity applicable to the CFC today: the Tucker Act. *See id.* at 213–14; *see also United States v. Tohono O'Odham Nation*, 563 U.S. 307, 314 (2011).

In the immediate aftermath of the Civil War, however, and before Congress passed the Tucker Act, Congress restricted the Court of Claims' authority. In 1868,

Congress passed the predecessor to 28 U.S.C. § 1500, "restrict[ing] the jurisdiction of the CFC and its predecessors when related actions are pending elsewhere." *Tohono O'Odham*, 563 U.S. at 310–11. Congress first enacted the provision "to curb duplicate lawsuits brought by residents of the Confederacy following the Civil War." *Id*. at 311. While the name of the court has changed, since 1948 the statute has otherwise provided that the court:

> [S]hall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

*See* 28 U.S.C. § 1500.

It has been well settled since "the time of the Constitutional Convention" that a sovereign cannot be sued without its consent. *Glidden Co. v. Zdanok*, 370 U.S. 530, 562–64 (1962) (plurality opinion) (citing *Williams v. United States*, 289 U.S. 553, 573 (1933)); *Beers v. Arkansas*, 61 U.S. 527, 529 (1858). And because a sovereign's consent to suit is "altogether voluntary," the sovereign "may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted." *Beers*, 61 U.S. at 529. A waiver of sovereign immunity must be "unequivocally expressed in the statutory text" and "strictly construed, in terms of its scope." *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) (internal quotation & citation omitted).

For these reasons, 28 U.S.C. § 1500, which limits the United States' waiver of sovereign immunity, must be construed strictly in the United States' favor. *See*

*Brandt v. United States*, 710 F.3d 1369, 1382 (Fed. Cir. 2013) (Prost, J. concurring); *see also Tohono O'Odham*, 563 U.S. at 317; *Blue Fox, Inc.*, 525 U.S. at 261; *Beers*, 61 U.S. at 529. This is especially so because the Tucker Act's waiver of sovereign immunity provides a path for obtaining monetary relief from the United States. Section 1500 serves as "a valid reservation of congressional control over funds in the Treasury," protecting Congress's power of the purse. *Cf. OPM v. Richmond*, 496 U.S. 414, 425, 428 (1990) (rejecting estoppel argument that would result in payment of funds from Treasury contrary to statute).

Thus, because it is a condition on the United States' waiver of sovereign immunity and because it protects the separation of powers by ensuring congressional control of the Treasury, § 1500 must be construed strictly in the United States' favor.

### B. Under § 1500, the Court is Divested of Jurisdiction When a Claim Based on the Same Operative Facts is Pending in Another Court Regardless of When It Was Filed.

With these principles of sovereign immunity in mind, the Court must consider the text of § 1500. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014) (for statutory interpretation, "Court relies on traditional rules of statutory interpretation . . . Analysis of the statutory text, aided by established principles of interpretation, controls"). Section 1500 provides that this Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . has pending in any other court any suit or process against the United States." 28 U.S.C. § 1500. As the Supreme Court has explained, "[t]he rule is more straightforward than its complex wording suggests." *Tohono O'Odham*, 563 U.S. at 311. It means

that "[t]he CFC has no jurisdiction over a claim if the plaintiff has another suit for or in respect to that claim pending against the United States or its agents." *Id.*

In *Tohono*, the Supreme Court clarified the meaning of "for or in respect to" the CFC claim. It held that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *Id.* at 317. Thus, § 1500 bars jurisdiction in this Court over a claim if a suit based on substantially the same operative facts is "pending in any other court."

The phrase "pending in any other court" is also straightforward. The plain meaning of "pending" has not changed since Congress enacted the precursor to § 1500 in 1868. "Pending," as an adjective, means "not yet decided" or "being in continuance." *Pending*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/pending (last accessed Nov. 13, 2026). Or, as a Civil War-era dictionary put it, pending can mean "[d]epending; remaining undecided; not terminated." Noah Webster, A DICTIONARY OF THE ENGLISH LANGUAGE 727 (1867). Black's Law Dictionary similarly defines "pending" as "[r]emaining undecided; awaiting decision <a pending case>." *Pending*, BLACK'S LAW DICTIONARY (12th ed. 2024).

The statute's plain meaning, then, is that if a plaintiff has a claim in any other court that is continuing—that is not yet decided—based on substantially the same operative facts as a claim in the CFC, the CFC does not have jurisdiction. 28 U.S.C. § 1500.

Nothing in the text of § 1500 limits its jurisdictional bar to the time of filing in the CFC. Rather, under the statute, the Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . *has pending* in any other court any suit or process against the United States." 28 U.S.C. § 1500 (emphasis added). The word "has" is the present tense third-person singular form of have. *Has*, Merriam-Webster, https://www.merriam-webster.com/dictionary/has (last accessed Nov. 13, 2026). By using the present tense phrase "has pending," the statute looks to whether a claim based on substantially the same operative facts is ongoing in another court.

An interpretation that looks only to whether a claim is pending in another court when the complaint is filed in the CFC conflicts with the principles of sovereign immunity. It would impermissibly broaden Congress's waiver of sovereign immunity by allowing cases to proceed in the CFC contrary to the unequivocal text of the statute. If a case is open and ongoing, it is "pending," regardless of when it was filed. Section 1500 prohibits jurisdiction in the CFC over claims for which a plaintiff has an ongoing suit in another court involving the same operative facts, regardless of the order of filing.

### C. <u>Congressional Intent and Precedent Support This Plain Reading of § 1500.</u>

Giving meaning to § 1500's plain language—that the CFC lacks jurisdiction over claims based on the same operative facts as claims pending in other courts—reflects Congress's intent to force litigants to choose between forums. *See UNR Indus., Inc. v. United States*, 962 F.2d 1013, 1017–18 (Fed. Cir. 1992) (en banc),

*aff'd sub nom. Keene Corp. v. United States*, 508 U.S. 200 (1993).[4] Litigants can choose the forum in which they wish to proceed, and they may even later choose to dismiss their first suit and pursue their claim in the other court. But Congress has required them to make a choice. Moreover, interpreting § 1500 to apply when a later district court case is filed also fits precedent on the need for an actual case or controversy—that jurisdiction must continue to exist throughout a case. *See Alvarez v. Smith*, 558 U.S. 87, 92 (2009); *Iowa Prot. and Advoc. Servs. v. Tanager, Inc.*, 427 F.3d 541, 543 (8th Cir. 2005); *Gospel Lighthouse Church, Inc. v. City of Dallas*, 999 F.2d 1580, 1580 (5th Cir. 1993) (per curiam). As the Federal Circuit had held in its prior en banc decision:

> Upon the occurrence of the triggering event, the filing of suit in another court, the Claims Court is automatically divested of jurisdiction. Congress wanted not to dictate the order in which a claimant files suits in the Claims Court and another court on the same claim, but to discourage him from doing so altogether. Otherwise the purpose of saving the government from defending the same claim in two courts at the same time would be defeated. Of course, it is axiomatic that once jurisdiction attaches, subsequent activities by the parties do not affect it. But the result here occurs by operation of law.

[4] In *UNR Industries*, the Federal Circuit, sitting en banc, overturned *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), in which the Court of Claims had added a judicial exception to Section 1500 for complaints filed in the now-Court of Federal Claims first. *See UNR Indus., Inc.*, 962 F.2d at 1020, 1023. The Supreme Court affirmed the Federal Circuit's judgment in *UNR Industries*, but stated that "[i]n applying § 1500 to the facts of this case, we find it unnecessary to consider, much less repudiate, the 'judicially created exceptions' to § 1500 found in *Tecon Engineers* . . . ." *Keene Corp. v. United States*, 508 U.S. 200, 216 (1993) (quoting *UNR Indus., Inc.*, 962 F.2d at 1021); *see also id.* at 209 n.4. The Federal Circuit has thus since continued to apply *Tecon* as good law. *See Brandt*, 710 F.3d at 1374, 1379 n.7; *see also id.* at 1380–81 & n.1 (Prost, J., concurring).

*UNR Indus.*, 962 F.2d at 1022–23 (internal citation omitted).

It would be incongruous to find that a condition on the United States' waiver of sovereign immunity, designed to prevent duplicative litigation in multiple courts, could be avoided by a mere reordering of filings. The Senate sponsor of the original version of § 1500, Senator Edmunds of Vermont, remarked on the Senate floor that "[t]he object of this amendment is to put to their election that large class of persons having cotton claims . . . The object is to put that class of persons to their election either to leave the Court of Claims or to leave the other courts." *Id.* at 1017–18 (quoting 81 Cong. Globe, 40th Cong., 2d Sess. 2769 (1868)). From this history, the Federal Circuit had concluded that "the statute was intended to force plaintiffs to choose between pursuing their claims in the Court of Claims or in another court." *Id.* at 1018. An order of filing rule lets plaintiffs avoid that choice.

The conclusion that § 1500 bars jurisdiction in the CFC when a claim based on the same operative facts is pending elsewhere, regardless of the order of filing, is also supported by early practice and interpretation. In several early cases, plaintiffs' claims were dismissed when the plaintiffs filed related claims in other courts *after* they filed claims in the Court of Claims. In *Maguire Industries v. United States*, a plaintiff initially sued in the Tax Court over a contract dispute that also involved a tax credit. 114 Ct. Cl. 687, 688 (1949) (en banc). When the Tax Court dismissed the plaintiff's suit for lack of jurisdiction, the plaintiff sued in the Court of Claims. *Id.* After doing so, the plaintiff also appealed the Tax Court's dismissal to the Court of Appeals for the District of Columbia Circuit. *Id.* The government then moved to

dismiss the Court of Claims case under § 1500. *Id.* at 688–89. The Court of Claims granted the motion and dismissed the plaintiff's action. *Id.* at 690.

Similarly, in *Hobbs v. United States*, the plaintiff filed a petition in the Court of Claims on August 29, 1963. 168 Ct. Cl. 646, 647 (1964) (en banc) (per curiam). The next day, August 30, the plaintiff filed a petition for review in the United States Court of Appeals for the Fifth Circuit, relating "to the same claim as the petition in [the Court of Claims]." *Id.* The Court of Claims concluded that, as a result, "the terms of [28 U.S.C. § 1500] clearly deprive this court of jurisdiction." *Id.*

The Supreme Court has applied the statute similarly. In *In re Skinner & Eddy Corp.*, a plaintiff petitioned the Supreme Court for a writ of mandamus. 265 U.S. 86, 91 (1924). The plaintiff had sued in the Court of Claims but ultimately moved to dismiss its complaint with prejudice. *Id.* The court granted the plaintiff's motion and the plaintiff then sued on essentially the same claims in state court in Washington. *Id.* at 92. But the United States later moved to set aside the Court of Claims dismissal and to allow the government to counterclaim. *Id.* The Court of Claims granted the motion and the plaintiff sought mandamus from the Supreme Court to restore the dismissal order and prohibit the exercise of further jurisdiction by the Court of Claims. *Id.* at 91–92.

The Supreme Court issued the writ. *Id.* at 96. Beyond the right of a plaintiff to dismiss his case, the Court pointed to a "special reason" in support of mandamus:

the predecessor to § 1500, section 154 of the Judicial Code.[5] *See id.* The Supreme Court concluded that the Court of Claims could not resume its jurisdiction by a "retroactive order" setting aside the prior dismissal because of the intervening state court suit. *Id.* That suit rendered Section 154 applicable and thus would have deprived the Court of Claims of jurisdiction even if it had not dismissed the plaintiff's complaint. *See id.*

Consistent with these cases, this Court should adopt the straightforward reading of § 1500 that whenever a plaintiff has a case pending in another court based on the same operative facts as a claim in the CFC, the CFC lacks jurisdiction over its case. That is what the text of the statute says. This interpretation respects the United States' waiver of sovereign immunity and follows the precedent of the Court of Claims and Supreme Court. Nothing in the statute's text or in the early practice and interpretation of it supports that the order of filing matters. The Court should apply the statute as written.

[5] Section 154 of the Judicial Code provided that "No person shall file or prosecute in the Court of Claims, or in the Supreme Court on appeal therefrom, any claim for or in respect to which he . . . has pending in any other court any suit or process . . . ." *In re Skinner & Eddy Corp.*, 265 U.S. at 96. The change in language to the current version of § 1500 in 1948 did not "work[] a change in the underlying substantive law," as the Revisor's Note "indicates nothing more than a change 'in phraseology.'" *See Keene Corp.*, 508 U.S. at 209 (quoting H.R. Rep. No. 308, 80th Cong., 1st Sess., A140 (1947)). The Revisor's Note also reports that the 1948 amendment removed "or in the Supreme Court on appeal therefrom" as "unnecessary." 28 U.S.C. § 1500 Revisor's Notes.

### D. <u>Alaska's CFC Complaint is Based on the Same Operative Facts as Its District Court Complaint.</u>

Alaska's complaint here is based on the same operative facts as its APA complaint in district court. That district court case is pending. Thus, based on the plain text of § 1500, the Court lacks subject matter jurisdiction over Alaska's complaint.

Alaska's APA case is pending in the District Court for the District of Alaska. *See generally* Docket, *Alaska v. U.S. Env't Prot. Agency*, No. 3:24cv84 (D. Alaska). In that case, Alaska alleges that it obtained the lands comprising the Pebble deposit, "in large part," by the Cook Inlet Land Exchange. *See* APA Compl. ¶ 22. It also asserts that the Pebble deposit has significant reserves of copper, gold, molybdenum, and silver. *Id.* ¶ 31. Alaska identifies in its complaint that the EPA issued the Final Determination. *See, e.g.*, *id.* ¶¶ 57–65. It pleads several counts challenging that Final Determination. *See id.* at 22–41. And Alaska seeks "an order holding unlawful and setting aside EPA's January 2023 final determination." *Id.* ¶ 1.

Those same facts—that Alaska obtained the lands including the Pebble deposit as part of a land exchange with the federal government and that the EPA issued its Final Determination under the CWA's Section 404(c) in January 2023—undergird Alaska's claims here. Alaska points to the Cook Inlet Land Exchange. Compl. ¶¶ 1–3. It alleges that the Pebble deposit was a part of the Land Exchange and that the deposit contains copper, gold, silver, and rare earth elements. *Id.* ¶¶ 6–7. It asserts that the EPA's Final Determination prohibits mining of the Pebble

deposit. *See id.* ¶ 9. The 2023 Final Determination forms the crux of Alaska's complaint and is the government action on which it bases its claims. *See* Compl. at 10 & ¶¶ 67–140.

The two cases are thus based on the same operative facts. In district court, Alaska challenges the Final Determination under the APA. Here, based on the same course of events, Alaska alleges that the same government action—the Final Determination—is a taking and breach of contract. Alaska's district court case is pending. Alaska's claims here are therefore barred by 28 U.S.C. § 1500 and the Court should dismiss them for lack of subject matter jurisdiction.

## II. The Court of Claims' *Tecon* Decision Does Not Mandate a Different Result.

In *Tecon*, as noted above, the Court of Claims turned away from its precedent and established a judicial exception to 28 U.S.C. § 1500. *See* 343 F.2d 943 (Ct. Cl. 1965). The court established what is often called an order-of-filing rule: it held that § 1500 serves as a jurisdictional bar only when the plaintiff has sued in another court first. *See id.* at 949. Thus, under *Tecon*, if a plaintiff sues in the CFC first, and sues in another court anytime later, § 1500 does no work. That rule, which renders § 1500 meaningless, does not control here.

### A. ***Tecon* is Distinguishable.**

*Tecon* can be distinguished from this case. Both the facts and posture of *Tecon* are significantly different. In *Tecon*, the plaintiff filed several suits in the Court of Claims beginning in December 1962, seeking tax refunds. *Id.* at 944 n.1. The Court of Claims focused on the fact that the case was a tax refund suit

involving shared jurisdiction. It began by noting the case implicated 28 U.S.C. § 1346 and that the Court of Claims and district courts shared concurrent jurisdiction over tax refund suits within the district court's amount in controversy limitation. *Id.* at 945. Indeed, the Court of Claims quoted the Supreme Court that under the Little Tucker Act, "a District Court sits 'as a court of claims.'" *Id.* (quoting *Glidden Co.*, 370 U.S. at 565). It concluded that "the District Courts and the Court of Claims have concurrent jurisdiction over suits for refund of taxes under the Tucker Act, and that in the exercise of this concurrent jurisdiction, the District Courts and the Court of Claims have equal status." *Id.* at 946.

*Tecon* may thus be limited to the circumstance where the district court's jurisdiction is invoked under the Little Tucker Act such that both the district court and CFC are sitting as "court[s] of claims." Alaska has not invoked the district court's Little Tucker Act jurisdiction in its suit against the EPA. APA Compl. ¶¶ 10–12. The Court would thus not be bound to follow *Tecon* and could apply § 1500 as its plain text requires.

The Court of Claims also focused in *Tecon* on what it viewed as an attempt to manipulate jurisdiction. The court had consolidated the plaintiff's suits and the parties proceeded with discovery and pretrial proceedings. *Tecon*, 343 F.2d at 944. About two years later, the cases were set for trial but the plaintiff sued "upon the same claims" in district court in Kentucky. *Id.* The plaintiff then moved to dismiss its petitions in the Court of Claims for lack of jurisdiction under 28 U.S.C. § 1500,

but the trial commissioner and Court of Claims rebuffed that effort. *Id.* at 944–45, 949–51.

*Tecon* can thus also be cabined to instances when a plaintiff files in district court after significant CFC litigation to deprive the CFC of jurisdiction and thereby avoid the court rendering a judgment. *See UNR Indus.*, 962 F.2d at 1020. Those circumstances are not present here and the Court should be free to apply § 1500's plain meaning.

### B. ***Tecon* was Wrongly Decided and, Following *Tohono*, the Court Should Dismiss the State's Complaint.**

*Tecon* was wrongly decided. To begin, the Court of Claims was not faithful to the text of § 1500. It held that "[t]he words 'shall not have jurisdiction' pertain solely to the acquiring or taking of jurisdiction by this court when the same plaintiff *already* 'has pending in any other court' another suit on the same claim." *Tecon*, 343 F.2d at 946 (emphasis added). But "already" does not appear in § 1500. The court's own explanation shows it needed to read another word into the statute for purposes of its interpretation. Similarly, the court held that the statute deprived the Court of Claims of jurisdiction over "any claim for or in respect to which plaintiff has pending in any other court any suit against the United States, only when the suit shall have been commenced in the other court before the claim was filed in this court." *Id.* at 949. Yet that entire last clause does not appear in § 1500.

The court also claimed "there is no requirement for express provision in the statute that this court can keep jurisdiction if suit was filed here first." *Id.* at 946. But that stands jurisdiction and sovereign immunity on its head. "[F]ederal

courts . . . are courts of limited jurisdiction marked out by Congress." *Chertkov v. Off. of Pers. Mgmt.*, 52 F.3d 961, 966 (Fed. Cir. 1995) (quoting *Aldinger v. Howard*, 427 U.S. 1, 15 (1976)). To sue the United States, a waiver of sovereign immunity must be "unequivocally expressed in the statutory text" and the waiver must be "strictly construed, in terms of its scope." *Blue Fox, Inc.*, 525 U.S. at 261 (internal quotation & citation omitted). Thus, there *is* a "requirement for express provision . . . that [the CFC] can keep jurisdiction if suit was filed [t]here first": the requirement that a waiver of sovereign immunity be "unequivocally expressed." *Tecon*, 343 F.2d at 946; *Blue Fox, Inc.*, 525 U.S. at 261. If Congress has not waived sovereign immunity and provided the Court with jurisdiction, the Court does not have any. And Section 1500 provides that the Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . has pending in any other court any suit or process against the United States." 28 U.S.C. § 1500. That plain language applies to claims in other courts that are ongoing—pending—regardless of the order of filing.[6]

As the Federal Circuit recognized in its prior en banc reversal, under *Tecon* "section 1500 . . . no longer serves its purposes: to force an election of forum and to prevent simultaneous dual litigation against the government. It is a rare plaintiff who could not find an exception to his liking if he tried hard enough." *UNR Indus.*,

[6] The Court of Claims also misread its precedents. The court claimed that the filings in *Hobbs* were simultaneous and that the issue of which case was filed first was not briefed or considered. 343 F.2d at 950 & nn.4, 7. That's incorrect. The Fifth Circuit petition was filed after the Court of Claims petition, and that later Fifth Circuit petition was the reason the court in *Hobbs* dismissed the case. 168 Ct. Cl. at 647.

962 F.2d at 1021. Looking to the plain language of the statute, the court stated that "[a] case filed subsequent to a Claims Court complaint is clearly a 'pending . . . suit or process.'" *Id.* at 1022. Thus, the court "revisit[ed] *Tecon*, an *aberrational* case which stands astride the path to a proper interpretation of section 1500 as it pertains to a post Claims Court filing in another court." *Id.* at 1023 (emphasis added). It held that "if the same claim is filed in another court after the complaint is filed in the Claims Court, the Claims Court is by that action divested of jurisdiction." *Id.* at 1021. While the Federal Circuit has since stated that its overruling of *Tecon* was dicta to which it would "not accord . . . *stare decisis* effect," *see Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1549 (Fed. Cir. 1994) (en banc), *overruling recognized by Ministerio Roca Solida v. United States*, 778 F.3d 1351, 1355–56 (Fed. Cir. 2015), its reasoning holds. *Brandt*, 710 F.3d at 1381 (Prost, J. concurring).

Moreover, the Supreme Court's more recent decision in *Tohono O'Odham* undermines *Tecon*. There, the Supreme Court decided the meaning of "for or in respect to" in § 1500. 563 U.S. at 309–10. The Court addressed the statute at length. It described § 1500 by saying "[t]he text of § 1500 reflects a *robust* response to the problem first presented by the cotton claimants." *Id.* at 312 (emphasis added). The Court also held that "[t]he rule in § 1500 effects a *significant jurisdictional limitation*, and Congress reenacted it even as changes in the structure of the courts made suits on the same facts more likely to arise. Doing so reaffirmed the force of

the bar and thus the commitment to curtailing redundant litigation." *Id.* at 314 (emphasis added).

While the order of filing was not implicated in *Tohono*, the Court had reason to address *Tecon* as part of the rationale for its decision. *See id.* at 314–15. The Federal Circuit below had observed that it "could not identify 'any purpose that § 1500 serves today,' in large part because it was bound by Circuit precedent that left the statute without meaningful force." *Id.* at 314 (quoting *Tohono O'Odham Nation v. United States*, 559 F.3d 1284, 1292 (Fed. Cir. 2009)). As an example, the Supreme Court pointed to the Federal Circuit's reliance on *Tecon*. *Id.* at 314–15. The Supreme Court then said that even though "[t]he *Tecon* holding is not presented in this case . . . the Court of Appeals was *wrong* to allow its precedent to suppress the statute's aim." *Id.* at 315 (emphasis added). It continued its admonishment of the Federal Circuit by saying that "[c]ourts should not render statutes nugatory through construction." *Id.*

The Court also observed that:

> An interpretation of § 1500 focused on the facts rather than the relief a party seeks preserves the provision as it was meant to function, and it keeps the provision from becoming a mere pleading rule, to be circumvented by carving up a single transaction into overlapping pieces seeking different relief.

*Id.*

The Supreme Court then concluded by noting that "considerations of policy divorced from the statute's text and purpose [cannot] override its meaning.

Although Congress has permitted claims against the United States for monetary relief in the CFC, that relief is available by grace and not by right." *Id.* at 317.[7]

The Supreme Court's decision thus rejects the rationale of *Tecon* and undermines its validity. True, the Federal Circuit has since stated that *Tecon* is the law of this Circuit. *See, e.g.*, *Res. Investments, Inc. v. United States*, 785 F.3d 660, 669–70 (Fed. Cir. 2015). But neither the Federal Circuit nor this Court is free to disregard language in Supreme Court opinions, even if that language could be classified as dicta. *Stone Container Corp. v. United States*, 229 F.3d 1345, 1349–50 (Fed. Cir. 2000); *see also Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001); *Nat. Res. Def. Council, Inc. v. Nuclear Regul. Comm'n*, 216 F.3d 1180, 1189 (D.C. Cir. 2000) ("Carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." (cleaned up)). As Justice Gorsuch, joined by Justice Kavanaugh, recently emphasized, "[l]ower court judges may sometimes disagree with th[e] Court's decisions, but they are never free to defy them." *Nat'l Inst. of Health*, 145 S. Ct. at 2663 (Gorsuch, J. concurring). Lower federal courts must follow precedents of the Supreme Court and "regardless of a decision's procedural posture, its 'reasoning—its *ratio decidendi*'—carries precedential weight in 'future cases.'" *Id.* (quoting *Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) (opinion of Gorsuch, J.)).

---

[7] Just last year, two justices cited to and relied on *Tohono* in discussing the meaning of Section 1500. *Nat'l Inst. of Health v. Am. Public Health Assoc.*, 606 U.S. __, 145 S. Ct. 2658, 2662 (2025) (Mem.) (Barrett, J. concurring); *id.* at 2674 n.4 (Jackson, J. concurring in part). It thus remains binding and relevant.

Moreover, when an intervening Supreme Court decision is irreconcilable with earlier circuit precedent, the circuit and trial courts are bound by the Supreme Court's intervening decision, not the earlier circuit precedent. *See Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014); *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc); *Blue Cross and Blue Shield of Kan. City Welfare Benefit Plan v. United States*, 173 Fed. Cl. 132, 150 (2024), *aff'd*, Nos. 24-2317, 25-1027, 2026 WL 2070084 (Fed. Cir. July 17, 2026); *see also* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 UCHILR 1175, 1177 (1989) (lower courts bound by both outcome of higher court's prior decision and "mode of analysis" in prior decision (emphasis omitted)). *Tecon* and *Tohono* are irreconcilable. This Court must thus follow *Tohono*. It is free to apply the plain language of § 1500 and should dismiss Alaska's complaint for lack of subject matter jurisdiction. If, however, the Court denies the United States' motion on the ground that *Tecon* compels such a result, the United States will need to consider whether and what appropriate appellate review is necessary to protect its limited waiver of sovereign immunity.[8]

## CONCLUSION

For the reasons above, the Court should dismiss Alaska's complaint for lack of subject matter jurisdiction.

[8] When Alaska moved for leave to file a bill of complaint in the Supreme Court, seeking to bring its APA and Tucker Act claims in one case under the Court's original jurisdiction, Alaska agreed with the United States' interpretation of 28 U.S.C. § 1500. *See* Br. in Supp. of Mot. for Leave to File Bill of Compl. 31–33, *State of Alaska v. United States*, No. 157, Original (July 26, 2023), Dkt. No. 1.

Respectfully submitted this 13th day of November, 2026,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/Brian R. Herman*
BRIAN R. HERMAN
Assistant Section Chief
United States Department of Justice
Energy & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 532-3278
Brian.Herman@usdoj.gov