# Exhibit A

TREG TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

FENNEMORE CRAIG P.C.
Norman D. James (AZ Bar No. 006901)
Tyler D. Carlton (AZ Bar No.035275)
2394 East Camelback Road, Suite 600
Phoenix, Arizona 85016
Phone: (602) 916-5000
Facsimile: (602) 916-5546
Email: njames@fennemorelaw.com
tcarlton@fennemorelaw.com
(*pro hac vice applications forthcoming*)

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| State of Alaska,<br><br>Plaintiff,<br><br>v.<br><br>United States Environmental Protection Agency,<br><br>Defendants. | Case No. ____________________<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. The State of Alaska ("Alaska" or "the State") brings suit against the United States Environmental Protection Agency ("EPA"), a federal agency, seeking an order holding unlawful and setting aside EPA's January 2023 final determination prohibiting the specification of, and restricting the use of, certain waters in southwestern Alaska as a disposal site for the discharge of dredged or fill material pursuant to Section 404(c) of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(c). *See* EPA, *Final Determination of the U.S. Environmental Protection Agency Pursuant to Section 404(c) of the Clean Water Act, Pebble Deposit Area, Southwest Alaska* (2023), https://www.epa.gov/system/files/documents/2023-01/Pebble-Deposit-Area-404c-FD-Jan2023.pdf (the "Final Determination").

2. EPA issued the Final Determination for the purpose of preventing development of the Pebble mineral deposit, which is a massive, world-class deposit of copper, gold, molybdenum, and other valuable minerals ("Pebble Deposit"). This mineral deposit is located in southwestern Alaska within land owned by the State, and its development is expected to generate billions of dollars in taxes and royalty payments that will fund essential governmental services in addition to providing thousands of high-paying jobs and other benefits to Alaska's citizens.

3. The Final Determination prohibits the specification of waters of the United States ("WOTUS") within a geographic area called the "Defined Area for Prohibition" as a disposal site under Section 404 of the CWA, 33 U.S.C. 1344. The Defined Area of

Prohibition contains approximately 24.7 square miles (15,808 acres), and covers the land area in which Northern Dynasty Minerals Ltd. ("Northern Dynasty") and Pebble Limited Partnership ("Pebble Partnership") (collectively "PLP") have proposed to construct and operate facilities and improvements necessary to mine the Pebble Deposit. This land, including the mineral estate, is owned by the State.

4. The Final Determination also restricts the future specification of WOTUS as a disposal site within a much larger area in connection with future proposals to construct and operate a mine to develop the Pebble Deposit ("Pebble Mine") that would result in adverse effects similar or greater in nature and magnitude to those described in subsections 4.2.1 through 4.2.4 of the Final Determination. This geographic area is called the "Defined Area for Restriction" and it contains approximately 309 square miles (nearly 200,000 acres). This land, including the mineral estate, is owned by the State.

5. The Final Determination prohibits the U.S. Army Corps of Engineers ("the Corps") from issuing permits authorizing the discharge of dredged or fill materials into WOTUS pursuant to Section 404(a) of the CWA, 33 U.S.C. § 1344(a), within the Defined Area for Prohibition in connection with constructing and operating the Pebble Mine.

6. In addition, the Final Determination severely restricts the Corps' ability to issue permits authorizing the discharge of dredged or fill materials into WOTUS pursuant to Section 404(a) of the CWA, 33 U.S.C. § 1344(a), in order to develop the Pebble Deposit outside the Defined Area for Prohibition but within the much larger Defined Area for Restriction.

7. The purpose of the Final Determination is to prevent or restrict the development of valuable minerals owned by the State and located within the State's real property, thereby injuring the State and its citizens. This action is a blatant affront to the sovereignty of Alaska, and ignores the State's numerous laws and regulatory programs that protect anadromous fish and other natural resources.

8. For the reasons alleged hereinafter, EPA's Final Determination and its overbroad and unsupported prohibitions on the discharge of dredged or fill material into WOTUS to prevent development of the Pebble Deposit are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the CWA and its implementing regulations, and are in excess of EPA's statutory authority.

9. To remedy EPA's violations of federal law, Alaska asks that the Final Determination be declared unlawful and set aside so that PLP and other persons that may seek to develop and mine the Pebble Deposit may apply for permits under Section 404 of the CWA, to the extent such permits may be required, and for such other and further relief necessary to protect Alaska's sovereign rights and interests in its lands and their mineral estate.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgment and associated relief), and the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

11. The Final Determination, issued by EPA in January 2023, is a final agency action for which Alaska has no other adequate remedy in a court. *See* 5 U.S.C. § 704.

12. Alaska has a right to judicial review of the Final Determination because Alaska has suffered legal wrong as the result of EPA's arbitrary and unlawful action and is adversely affected by such action, which is preventing the development of valuable minerals owned by the State and located within the State's real property. *See* 5 U.S.C. § 702.

13. Venue lies in this judicial district because the lands and related mineral interests that are subject to the Final Determination are located in southwest Alaska and therefore within this judicial district.

**PARTIES**

14. The defendant in this action, EPA, is an agency of the United States government that administers various federal laws including the CWA. EPA's Administrator is authorized to prohibit the specification of WOTUS as disposal sites for dredged or fill material and to deny or restrict the use of defined areas within WOTUS for specification as disposal sites for dredged or fill material under certain conditions. *See* 33 U.S.C. § 1344(c).

15. The Final Determination was issued pursuant to 33 U.S.C. § 1344(c) by EPA's Assistant Administrator for the Office of Water, Radhika Fox, on January 30, 2023. In doing so, Ms. Fox was acting on behalf of the Administrator of EPA.

16. Plaintiff State of Alaska owns the lands included within the Defined Area for Prohibition and the Defined Area for Restriction, including the lands containing the

Pebble Deposit. Mining the Pebble Deposit's valuable minerals would provide thousands of jobs to Alaskans and billions of dollars in royalties, fees, and taxes to the State, providing a significant source of revenue for essential governmental services and programs.

17. As a sovereign state and pursuant to its public trust responsibilities, Alaska has a significant interest in the management of its lands and natural resources. Article 8, § 2 of the Alaska Constitution provides that the State "shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of the people." Alaska Const. art. 8, § 2.

18. When it enacted the CWA, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with [EPA] in the exercise of [the agency's] authority under this chapter." 33 U.S.C. § 1251(b). The Final Determination unlawfully interferes with Alaska's traditional and primary power over land and water use.

19. Alaska's interests as a landowner and as a sovereign responsible for the management of the State's natural resources, including anadromous fish, are legally protected interests that are injured by the Final Determination, which prevents or restricts development of the Pebble Deposit and related uses of the State's lands. These injuries are concrete and particularized and are actual or imminent.

20. The injuries to Alaska's interests as landowner and as a sovereign are directly traceable to EPA's Final Determination, which prevents or restricts development of the Pebble Deposit.

21. Alaska's injuries will be redressed by a favorable decision setting aside EPA's Final Determination and removing the unlawful prohibitions and restrictions the agency has imposed on the discharge of dredged or fill materials into WOTUS within the Defined Area for Prohibition and the Defined Area for Restriction.

**BACKGROUND ON THE PEBBLE DEPOSIT AND THE PROPOSED PEBBLE MINE**

22. Alaska acquired the Pebble Deposit and surrounding lands, in large part, in 1976 by means of a three-way land exchange with the United States and the Cook Inlet Region, Inc., an Alaskan Native corporation. *See* Pub. L. No. 94-204, 89 Stat. 1145 (1976). In that exchange, Alaska obtained title to approximately 525,000 acres of federal land in the Lake Iliamna area and in the Nushagak River and Koksetna River drainages of Bristol Bay, approximately 200 miles southwest of Anchorage.

23. The lands acquired by the State through the land exchange were designated "for all purposes" as if they were conveyed to the State pursuant to Section 6 of the Alaska Statehood Act. *See* Pub. L. No. 94-204, § 12(d)(1). Section 6(i) of the Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339, 342 (1958), provides that all grants of land made or confirmed under the Act "shall include mineral deposits." This provision further provides that "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." *Id.*

24. Alaska acquired the remaining lands in the vicinity of the Pebble Deposit through Statehood Act land selections. As Statehood Act selections, those lands were also acquired subject to the Act's provision that mineral deposits in such lands be subject to lease by the State. *See id.*

25. Because of Alaska's unique circumstances, including its lack of a private land base and extremely small population, the Statehood Act expressly granted Alaska the right to select over 103 million acres of federal land, along with the underlying mineral resources. These lands could then be utilized to generate the revenues needed to fund State government and provide essential services to Alaska's residents.

26. Under the Statehood Act, the conveyance of mineral rights was deemed so essential to the State's ability to provide for itself that, should the State convey the surface estate of selected lands, it was required to reserve all mineral rights or forfeit those rights back to the federal government. Alaska Statehood Act, Pub. L. No. 85-508, § 6(i). The lands Alaska acquired through the land exchange with the United States and the Cook Inlet Region, Inc. are likewise subject to these requirements.

27. The land in which the Pebble Deposit is located and the surrounding land has been subject to mineral exploration and development in accordance with the laws of Alaska since its acquisition many years ago. As this mineral-rich land is developed and mined, significant revenues would be generated for the State through royalty payments, taxes, and other fees, funding essential governmental services and functions, in addition to providing high-paying jobs and other benefits for Alaska's citizens.

28. The initial discovery of the Pebble Deposit was made in 1989 by Cominco Alaska, a division of Cominco Ltd. Cominco staked mineral claims on land containing the deposit in accordance with Alaska law.

29. The mineral claims located by Cominco changed ownership several times, until Northern Dynasty acquired the claims in 2005. In 2007, Northern Dynasty formed PLP with another mining company and transferred the mineral claims to PLP. At present, PLP is a wholly owned subsidiary of Northern Dynasty and is the owner of the mineral claims.

30. PLP and the prior owners of the mineral claims conducted exploration and development activities, including extensive exploratory drilling, which expanded the knowledge of the Pebble Deposit's vast size, extent, and mineral content, as well metallurgical, environmental, and engineering studies to evaluate how to mine the deposit. This work expanded the extent of known mineral resources, identified additional areas of high-grade mineralization, and indicated that the Pebble Deposit possesses the ore volumes, grades, and metallurgical characteristics needed to support a modern mine with a significant operational life.

31. Today, the Pebble Deposit is recognized as one of the largest undeveloped copper deposits in the world. It is estimated to contain 57 *billion* pounds of copper, as well as 71 million ounces of gold, 3.4 billion pounds of molybdenum, 345 million ounces of silver, and other valuable minerals.

32. Based on this information, PLP developed a proposal to mine the Pebble Deposit ("Pebble Mine"). The Pebble Mine would proceed in four phases: construction, operations (also called the production phase), closure, and post-closure.

33. Construction of the facilities and associated infrastructure needed to operate the Pebble Mine would take about five years. The work force during mine construction was expected to peak at a minimum of 2,000 persons.

34. The operations phase was estimated to last decades. During this phase, the project was expected to employ approximately 850 employees. Closure and post-closure activities, including decommissioning the production-related facilities and reclaiming disturbed areas, would then take place over several decades.

35. As planned, the Pebble Mine would provide enormous benefits to Alaska and its citizens. It was estimated in the Corps' Pebble Project Final Environmental Impact Statement (July 2020) ("FEIS")[1] that the mine would provide the State with more than $100 million per year through state taxes, licensing fees, and royalty payments. It was also estimated that over the five-year construction phase and the decades-long operations phase, payments to the State would total $2.63 billion. In addition, the Pebble Mine would create significant employment opportunities in a remote portion of Alaska where employment is otherwise limited.

[1] The FEIS is available at https://www.arlis.org/docs/vol1/Pebble/Final-EIS/ (last visited Apr. 6, 2024).

## PLP'S APPLICATION FOR A SECTION 404 PERMIT AND THE CORPS' ENVIRONMENTAL IMPACT STATEMENT

36. The Pebble Deposit and the site of the proposed mine are located in the headwaters of three streams: the North Fork Koktuli River ("NFK"), South Fork Koktuli River ("SFK"), and Upper Talarik Creek ("UTC").

37. The NFK is 36 miles in length, while the SFK is 40 miles in length. These two streams join southwest of the mine site to form the Koktuli River, which flows 39 miles downstream into the Mulchatna River. The Mulchatna River flows 44 miles south and west before joining the Nushagak River. The Nushagak River flows an additional 109 miles before discharging into Bristol Bay.

38. UTC is located to the east of the mine site in a different watershed. UTC flows southeast for 39 miles and discharges into Iliama Lake, a large inland lake located east and south of the mine site. Iliama Lake drains into the Kvichak River, which flows 50 miles downstream into Bristol Bay.

39. The NFK, SFK, and UTC subbasins contain in total about 355 square miles. By contrast, the Bristol Bay watershed contains about 39,184 square miles, or an area roughly the size of the State of Ohio. Together, the three subbasins comprise only 0.9 percent (0.009) of the Bristol Bay watershed and contain a tiny fraction of the watershed's rivers, lakes, and streams supporting anadromous fish.

40. The CWA generally prohibits discharges of pollutants to navigable waters without a permit or other authorization. *See* 33 U.S.C. § 1311(a). The term "navigable waters" is defined by the CWA as "the waters of the United States, including the

territorial seas." *See* 33 U.S.C. § 1362(7). The term "discharge of a pollutant" is defined in the CWA to include "any addition of any pollutant to navigable waters [i.e., WOTUS] from any point source," while the term "pollutant" includes not only traditional contaminants but also solid materials such as sand, rock, and dirt. *See* 33 U.S.C. § 1362(6), (12).

41. WOTUS includes traditional interstate waterways used, or capable of being used, in interstate commerce, i.e., waters that are "navigable in fact" or readily capable of being made so. *See*, *e.g.*, *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (plurality opinion) (citing *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1870), and *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406 (1940)).

42. In addition, WOTUS includes relatively permanent streams and other water bodies that are connected to a traditional navigable water as well as wetlands that are adjacent to either a traditional navigable water or a relatively permanent water. To be considered adjacent, a wetland must "have a continuous surface connection to bodies that are [WOTUS] in their own right, so that there is no clear demarcation between waters and wetlands." *Sackett v. EPA*, 598 U.S. 651, 678 (2023) (quoting *Rapanos*, 547 U.S. at 742) (internal quotation marks removed).

43. One of the ways to obtain authority to lawfully discharge into water bodies and wetlands that are WOTUS is through a Section 404 permit. *See* 33 U.S.C. § 1311(a). Section 404(a) of the CWA authorizes the Corps to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a). Section 404(b) sets forth the requirements for the Corps' specification of

disposal sites for such materials, including compliance with certain guidelines developed jointly by EPA and the Corps. *See id.* § 1344(b).

44. In 2017, PLP applied for a permit from the Corps under Section 404 of the CWA. The Section 404 permit would authorize PLP to discharge fill materials into water bodies and wetlands at specified sites in constructing and operating the mine's on-site facilities and infrastructure. The permit would also allow PLP to discharge fill material in connection with constructing certain off-site infrastructure, including access roads, a natural gas pipeline, fiber-optic cable, and various port facilities.

45. The discharge of fill materials would impact portions of the upper NFK, the upper SFK, a small portion of the upper UTC, and certain wetlands. To Alaska's knowledge, an approved jurisdictional determination was never issued by the Corps or EPA. *See* 33 C.F.R. § 331.2 (defining "Approved Jurisdictional Determination" and "Jurisdictional Determination"). Consequently, the extent of WOTUS in the vicinity of the Pebble Mine, including the Defined Area for Prohibition and the Defined Area for Restriction, has never been the subject of such a jurisdictional determination.

46. The submission of PLP's permit application triggered the development of an environmental impact statement ("EIS") to evaluate and disclose the impacts of the Pebble Mine on the human environment in accordance with the National Environmental Policy Act ("NEPA"). *See* 42 U.S.C. § 4332(C). In connection with preparing the EIS, the Corps acted as the lead federal agency, and seven federal agencies (including EPA), the State, and other non-federal entities served as cooperating agencies.

47. As a cooperating agency, EPA was involved in the NEPA process and provided input on issues within its specific areas of jurisdiction and expertise, including compliance with the CWA, to ensure full and fair disclosure of the probable impacts of the proposed project in the EIS.

48. During the Corps' review of PLP's Section 404 permit application and the NEPA process, PLP had numerous discussions and received feedback and suggestions from the Corps, EPA, and other regulatory agencies. Based on these discussions, PLP modified and refined its mine plan ("Mine Plan"), including, for example, an extensive suite of monitoring and mitigation measures, and submitted a revised permit application to the Corps based on the modified Mine Plan in 2020.

49. In July 2020, the Corps published the FEIS evaluating the probable impacts of the Pebble Mine on the human environment. The FEIS describes in detail the mine's probable impacts on anadromous and native fish resources, fish habitat, including commercial and recreational fisheries, streamflow and water quality, and other environmental impacts in the NFK, SFK, and UTC watersheds, as well as environmental impacts relating to off-site transportation facilities and natural gas infrastructure.

50. The FEIS explains that development of the Pebble Mine could permanently remove approximately 8.5 miles of anadromous fish stream habitat and 14.1 miles of resident fish and invertebrate stream habitat, but that the loss of such habitat is not expected to have measurable impact on fish populations based on physical habitat characteristics and fish density estimates in the affected reaches of the NFK and the SFK.

There would be more limited impacts in the UTC subbasin, based on the small amount of mine-related improvements and activities planned in that watershed.

51. The FEIS explains that the waters within the mine site lack high-quality fish spawning and rearing habitat characteristics compared to downstream fish habitat in the NFK and the SFK. Most adult fish and spawning observations for Pacific salmon occur downstream of streams directly affected by the Pebble Mine. Moreover, observed densities of juvenile salmon in streams around the mine site are substantially lower than in downstream reaches, which contain more favorable habitat conditions for salmon.

52. The FEIS explains that any impacts of the Pebble Mine would be localized and not extend beyond the upper portions of the NFK and SFK drainages. It also explains that the affected stream habitat for salmon and other fish constitutes a very small portion of the Koktuli River watershed and a miniscule portion of Bristol Bay's 39,184-square-mile watershed. By contrast, the NFF watershed contains about 113 square miles and the SFK watershed contains about 107 square miles.

53. The FEIS explains that the Pebble Mine would not cause a measurable change in the number of Pacific salmon returning to Bristol Bay, and that under normal operations, the mine would not be expected to have a measurable effect on fish numbers or result in long-term changes to the health of the commercial fisheries in Bristol Bay.

54. The FEIS has not been withdrawn or supplemented.

55. Yet on November 25, 2020, the Corps' Alaska District issued a decision denying PLP's amended Section 404 permit application. PLP administratively appealed

the permit decision. The State, as landowner and lessor of the mineral deposit, also appealed, but the Corps dismissed the State's appeal.

56. On April 24, 2023, PLP's appeal of the Corps' decision led to a remand, requiring reconsideration of the decision. The permit decision was remanded to the Corps' Alaska District for reconsideration, additional evaluation, and documentation sufficient to support denial of PLP's permit application. At this time, the Alaska District has not issued a new decision.

**EPA'S FINAL DETERMINATION UNDER SECTION 404(c)**

57. Section 404(c) of the CWA authorizes EPA, subject to certain conditions and prerequisites, to prohibit or restrict the use of specific areas as disposal sites for dredged or fill material. This provision, in relevant part, states:

> The Administrator [of EPA] is authorized to prohibit the specification . . . of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification . . . as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the [Corps]. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

33 U.S.C. § 1344(c).

58. In January 2022, Region 10 of EPA notified the Corps, the Alaska Department of Natural Resources, PLP, and other entities holding mineral claims or interests in mineral claims ("the Parties") of the region's intention to issue a proposed determination under Section 404(c). *Bristol Bay 404(c) Timeline*, EPA,

https://www.epa.gov/bristolbay/bristol-bay-404c-timeline (last visited Apr. 6, 2024). Region 10 indicated that it believed that the discharge of dredged or fill material in connection with mining the Pebble Deposit could result in unacceptable adverse impacts to important fisheries areas. *Id.*

59. Following the submission of responses to Region 10's notice and meetings with the claim holders, on May 26, 2022, Region 10 announced the availability of its proposed Section 404(c) determination to prohibit and restrict the use of certain waters in the Bristol Bay watershed as disposal sites for the discharge of dredged or fill material associated with mining the Pebble Deposit. *Id.* EPA stated that the proposed determination "would help protect the Bristol Bay watershed's rivers, streams, and wetlands that support the world's largest sockeye salmon fishery and a subsistence-based way of life [for] Alaska Native communities." *See id.*

60. On September 6, 2022, Alaska submitted detailed comments to the Regional Administrator opposing the proposed Section 404(c) determination on multiple grounds.

61. Following several public meetings and consideration of public comments, on December 1, 2022, Region 10 transmitted its recommended Section 404(c) determination to EPA's Assistant Administrator for the Office of Water for final review and action.

62. On the following day, the Assistant Administrator for the Office of Water notified the Parties that she had received the region's recommended Section 404(c) determination and provided them with an opportunity to advise EPA "of their intent to

take corrective action to prevent unacceptable adverse effects on anadromous fishery areas from certain discharges of dredged or fill material associated with developing the Pebble deposit." 88 Fed. Reg. 7441, 7442 (Feb. 3, 2023).

63. Although most of the Parties submitted written responses to the Assistant Administrator, including Alaska, EPA's Assistant Administrator for the Office of Water determined that none of the parties had identified corrective action sufficient to prevent unacceptable adverse effects. *Id.*

64. On about January 30, 2023, EPA's Assistant Administrator for the Office of Water issued the Final Determination. *See id.* at 7443. In that agency decision, EPA "determined that the discharges of dredged or fill material for the construction and routine operation of the mine identified in [PLP's] 2020 Mine Plan . . . at the Pebble deposit will have unacceptable adverse effects on anadromous fishery areas in the SFK and NFK watersheds." Final Determination at 5-1 to 5-2 (footnote omitted).

65. EPA "also determined that discharges of dredged or fill material for the construction and routine operation of a mine to develop the Pebble deposit anywhere in the mine site area (Figure 4-1) within the SFK and NFK watersheds that would result in the same or greater levels of loss or streamflow changes as the 2020 Mine Plan also will have unacceptable adverse effects on anadromous fishery areas in these watersheds, because such discharges would involve the same aquatic resources characterized as part of the evaluation of the 2020 Mine Plan." Final Determination at 5-2.

66. PLP's 2020 Mine Plan was designed to utilize the smallest disturbance footprint that would allow a commercially viable mine to be developed and operated.

Consequently, the Final Determination effectively precludes the development of a commercially viable mining project throughout the Designated Area of Restriction, ensuring that the Pebble Deposit cannot be profitably mined.

67. EPA's primary goal in issuing the Final Determination was to prevent the development and operation of a commercially viable mining operation within the Designated Area of Restriction so that the Pebble Deposit will not be mined.

**EPA'S PROHIBITION DETERMINATION**

68. In the Final Determination, EPA prohibited the specification of WOTUS within the Defined Area for Prohibition as disposal sites for the discharge of dredged or fill material for the construction and routine operation of PLP's 2020 Mine Plan. The prohibition includes any future proposals to construct and operate a mine to develop the Pebble Deposit that would involve discharges of dredged or fill material into WOTUS within the Defined Area for Prohibition with the same or greater levels of loss of stream flow changes as those resulting from PLP's 2020 Mine Plan. Final Determination at 5-2.

69. The Defined Area for Prohibition contains approximately 24.7 square miles (15,808 acres) and covers the general area within which PLP proposed to construct and operate facilities to mine the Pebble Deposit. However, the Final Determination does not identify what water bodies and wetlands within the Defined Area for Prohibition constitute WOTUS and are subject to EPA's Section 404(c) prohibition. Consequently, the specific water bodies and wetlands subject to EPA's Section 404(c) prohibition were not actually specified by EPA.

70. EPA's stated basis for determining that the discharge of dredged or fill material for the routine operation of PLP's 2020 Mine Plan would have an unacceptable adverse effect and therefore support the prohibition under CWA Section 404(c) was limited to the mine's effects on anadromous fishery areas in the NFK and the SFK watersheds. Final Determination at 5-1 to 5-3. The UTC watershed was not included.

71. EPA identified four aquatic resource issues and streamflow losses within the NFK and the SFK watersheds and explained that each of them would independently have unacceptable adverse effects on anadromous fishery areas in those watersheds. Those issues and streamflow losses are:

(1) The loss of approximately 8.5 miles of documented anadromous fish streams (Final Determination, § 4.2.1).

(2) The loss of approximately 91 miles of additional streams that support anadromous fish streams (Final Determination, § 4.2.2)

(3) The loss of approximately 2,108 acres of wetlands and other waters that support anadromous fish streams (Final Determination, § 4.2.3); and

(4) Adverse impacts on approximately 29 additional miles of anadromous fish streams resulting from reductions in average monthly streamflow projected to exceed 20 percent (Final Determination, § 4.2.4).

Final Determination at 5-2.

72. EPA did not determine that the discharge of dredged or fill material for the routine operation of PLP's 2020 Mine Plan would have an unacceptable adverse effect on any anadromous fishery areas downstream of the confluence of the NFK and the SFK,

including the Nushagak River and the Bristol Bay fishery. *See* Final Determination at 5-1 to 5-3.

**EPA'S RESTRICTION DETERMINATION**

73. EPA also determined that discharges of dredged or fill material associated with future proposals to construct and operate a mine to develop the Pebble Deposit will have unacceptable adverse effects on anadromous fishery areas "anywhere in the SFK, NFK, and UTC watersheds if the adverse effects of such discharges are similar or greater in nature and magnitude to the adverse effects of the 2020 Mine Plan described in Sections 4.2.1 through 4.2.4." Final Determination at 5-7 (footnotes omitted).

74. The unacceptable adverse effects on anadromous fishery areas described in Sections 4.2.1 through 4.2.4 are the four aquatic resource issues and streamflow losses within the NFK and the SFK watersheds set forth in EPA's prohibition determination at page 5-2 of the Final Determination. *See* Final Determination at 5-12.

75. The Defined Area for Restriction contains approximately 309 square miles (about 200,000 acres) and covers an area that is many times the size of the Pebble Deposit, including virtually all of the NFK and SFK watersheds and a substantial portion of the UTC watershed. EPA's intent in restricting activities throughout this enormous area is to prevent future attempts to develop a large scale, commercially viable mining operation in that area.

76. The Final Determination does not identify what water bodies and wetlands within the Defined Area for Restriction constitute WOTUS and are subject to EPA's

Section 404(c) restriction. Consequently, the specific water bodies and wetlands subject to EPA's Section 404(c) restriction were not actually specified.

77. EPA's restriction applies to proposed discharges of dredged or fill materials into WOTUS associated with developing the Pebble Deposit within the Defined Area for Restriction. However, EPA has not determined what water bodies and adjacent wetlands found in the NFK, SFK, and UTC watersheds constitute WOTUS and, thus, are subject to the EPA's jurisdiction under the CWA. Therefore, the extent of the restriction is unknown.

78. EPA did not determine that the discharge of dredged or fill material for the routine operation of PLP's 2020 Mine Plan would have an unacceptable adverse effect on any anadromous fishery areas downstream of the confluence of the NFK and the SFK, including the Nushagak River and the Bristol Bay fishery. *See* Final Determination at 5-1 to 5-3, 5-7 to 5-8.

## SPECIFIC CLAIMS FOR RELIEF

### <u>First Claim for Relief</u>

### (Failure to Properly Specify the Areas of Prohibition and Restriction)

79. The State incorporates by reference the allegations set forth in paragraphs 1 to 78 hereinabove.

80. Under Section 404(c) of the CWA, EPA may ***<u>prohibit</u>*** the specification of any defined area as a disposal site for dredged or fill materials upon a determination that "the discharge of such materials into such area will have an unacceptable adverse effect

on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c).

81. In addition, under Section 404(c) of the CWA, EPA may *restrict* the use of any defined area for specification as a disposal site for dredged or fill materials upon a determination that "the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.*

82. Regardless of whether EPA prohibits specification or imposes restrictions on specification, Section 404(c) requires that EPA identify a "defined area" that is subject to the prohibition or restriction.

83. EPA lacks authority to prohibit or restrict the use of a "defined area" as a disposal site under Section 404(c) of the CWA if the defined area is not a WOTUS and subject to federal jurisdiction under the CWA.

84. Neither the Corps nor EPA has issued an approved jurisdictional determination for any of the water bodies and wetlands within the Defined Area for Prohibition.

85. Neither the Corps nor EPA has issued an approved jurisdictional determination for any of the water bodies and wetlands within the Defined Area for Restriction.

86. When it issued the Final Determination, EPA did not know what water bodies and wetland areas within the Defined Area for Prohibition and the Defined Area for Restriction are WOTUS and subject to federal jurisdiction under the CWA. Instead,

EPA improperly assumed that all water bodies and wetlands present within the Defined Area for Prohibition and the Defined Area for Restriction are WOTUS.

87. Rather than identifying specific areas within WOTUS in the Final Determination, EPA described large blocks of land as the defined areas for specification. Those areas are not WOTUS and are not subject to federal jurisdiction under the CWA.

88. The Defined Area for Prohibition contains nearly 16,000 acres of land, most of which land is not WOTUS. Similarly, the Defined Area for Restriction contains some 200,000 acres of land, most of which land is not WOTUS. In both cases, it is uncertain what areas, if any, are actually subject to prohibition or restriction.

89. In issuing the Final Determination, EPA acted unlawfully and in excess of its statutory jurisdiction by failing to identify for prohibition or restriction any specific areas within WOTUS as "defined areas," as Section 404(c) requires, and instead attempting to assert jurisdiction over large tracts of State land that do not constitute WOTUS in order to stop the Pebble Mine.

90. EPA's issuance of the Final Determination without first determining what water bodies and wetlands are WOTUS and limiting the prohibition and restriction to defined areas within WOTUS was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. In the alternative, such determination was in excess of EPA's authority under Section 404(c) and therefore unlawful.

## Second Claim for Relief

**(Lack of Unacceptable Adverse Effects to Fisheries)**

91. The State incorporates by reference the allegations set forth in paragraphs 1 to 90 hereinabove.

92. In order to lawfully prohibit or restrict the use of a defined area as a disposal site under CWA Section 404(c), EPA is required to determine that the discharge of dredged or fill materials into such area "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c).

93. EPA's regulations define "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or *significant loss of or damage to fisheries*, shellfishing [*sic*], or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e) (emphasis added).

94. EPA's basis for prohibiting the specification of areas for the disposal of dredged or fill materials in the Defined Area of Prohibition and for restricting the use of areas for the disposal of dredged or fill materials in the Defined Area for Restriction is that the use of such areas as disposal sites would have an unacceptable adverse effect on anadromous fisheries areas in the NFK and SFK watersheds.

95. EPA asserted that the discharges of dredged or fill material for the construction and routine operation of the Pebble Mine would have an unacceptable adverse effect on anadromous fishery areas in the NFK and SFK watersheds based on

four aquatic losses and streamflow changes. *See* Final Determination at 5-1 to 5-2, 5-12. None of those alleged losses and streamflow changes, either singly or together, legitimately supports a finding of unacceptable adverse effect.

96. The ordinary meaning of "fishery" is "an area of water where fish are caught, especially in order to sell them." *See Fishery*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/fishery (last visited Apr. 6, 2024). The mere presence of fish in a lake or a stream does not constitute a fishery.

97. There are no anadromous fisheries in the NFK and SFK watersheds that would be adversely impacted by the Pebble Mine.

98. In the Final Determination, EPA did not explain the basis for treating the upper NFK and the upper SFK as anadromous fisheries.

99. No commercial fishing for Pacific salmon species takes place in the NFK and SFK watersheds. Furthermore, no commercial fishing takes place in the Kotuli River system generally.

100. Very little recreational fishing occurs on the Kotuli River (including the NFK and the SFK). The Koktuli River does not appear in some Alaska Department of Game and Fish publications because not enough survey respondents report fishing on the river.

101. The upper portions of the NFK and the SFK in the vicinity of the Pebble Deposit provide marginal habitat for Pacific salmon and other anadromous fish and support a limited number of anadromous fish.

102. Streams directly impacted by the Pebble Mine tend to have higher gradients, fewer off-channel and overwintering habitats, lower proportions of spawning gravels, and less woody debris when compared to downstream habitats.

103. Regardless of what might occur in the uppermost portions of the NFK and the SFK that are directly impacted by mine construction and operation, impacts on Pacific salmon and other anadromous fish are not expected to be noticeable in the Kotuli River downstream of such streams.

104. Observed densities of juvenile salmon in streams around the Pebble Mine site are substantially lower than in downstream reaches, where more favorable habitat conditions are present.

105. The majority of adult fish and spawning observations for Pacific salmon occurred considerably downstream of waters directly impacted by mine facilities.

106. Downstream reaches of the NFK and the SFK are not expected to be significantly impacted by the construction and operation of the Pebble Mine.

107. The loss of fish habitat and wetlands in the upper NFK and SFK due to the construction and operation of the Pebble Mine are not expected to have measurable effects on Pacific salmon and other anadromous fish downstream of the confluence of the Kotuli River and the Mulchatna River.

108. The habitat for Pacific salmon and other anadromous fish in the NFK and the SFK watersheds constitutes a miniscule portion of Bristol Bay's 39,184-square mile watershed. By contrast, the NFK watershed contains about 113 square miles, which is a

mere 0.3 percent (0.003) of the Bristol Bay watershed. The SFK watershed similarly is about 107 square miles, which is only 0.3 percent (0.003) of the Bristol Bay watershed.

109. The Nushagak River and Kvichak River watersheds contain over 33,000 miles of streams. The headwater streams in the NFK and SFK watersheds in the vicinity of the Pebble Mine constitute a tiny percentage of the total streams in the Nushagak River and Kvichak River watersheds and contain a miniscule amount of the habitat for anadromous fish, compared to the watersheds as a whole. There is no credible evidence that the loss of a portion of the headwater streams in the vicinity of the Pebble Mine will have a measurable effect on anadromous fish populations in either river system.

110. The loss of fish habitat and adjacent wetlands in the upper NFK and SFK and related disturbance in or near the mine site is not expected to have a measurable effect on fish numbers or result in long-term changes to the health of the commercial fisheries in Bristol Bay.

111. The loss of fish habitat and adjacent wetlands in the upper NFK and SFK due to the construction and operation of the Pebble Mine is not expected to have measurable effects on the number of adult salmon returning to the Nushagak River and Kvichak River districts. The mine site area is not connected to the Togiak, Ugashik, Naknek, and Egegik watersheds and will not affect salmon populations or harvests from those watersheds.

112. In the Final Determination, EPA failed to explain how the loss of headwater streams and adjacent wetlands due to the construction and operation of the

Pebble Mine will cause a significant loss of, or damage to, the Bristol Bay Pacific salmon fishery.

113. The Final Determination fails to provide credible scientific information showing that the loss of headwater streams and adjacent wetlands in the NFK and SFK watersheds due to the construction and operation of the Pebble Mine will result in significant loss of, or damage, to any fisheries.

114. EPA's determination that the discharge of dredged or fill material for the construction and routine operation of the Pebble Mine will have unacceptable adverse effects on anadromous fishery areas in the NFK and SFK watershed was arbitrary, capricious, and abuse of discretion, or otherwise contrary to law. In the alternative, such determination was in excess of EPA's authority under Section 404(c) and therefore unlawful.

**Third Claim for Relief**

**(Failure to Properly Quantify and Weigh Costs and Benefits)**

115. The State incorporates by reference the allegations set forth in paragraphs 1 to 114 hereinabove.

116. In the absence of a statute that clearly requires EPA to base its decision on specific factors that do not include their costs, EPA must weigh the costs and the benefits of its proposed action in order to engage in reasoned decision-making and to avoid acting in an arbitrary and capricious manner. *See*, *e.g.*, *Michigan v. EPA*, 576 U.S. 743, 479-51, 755 (2015).

117. In order to lawfully prohibit or restrict the use of a defined area as a disposal site under CWA Section 404(c), EPA is required to determine that the discharge of dredged or fill materials into such area "will have an *unacceptable adverse effect* on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c) (emphasis added).

118. The use of the phrase "unacceptable adverse effect" in Section 404(c) indicates that adverse effects of discharges of dredged or fill material into WOTUS containing fishery areas are not, by themselves, grounds to prohibit or restrict the use of a particular WOTUS as a disposal site. The adverse effects must be "unacceptable" as well.

119. The term "unacceptable" means "too bad to be accepted, approved of, or allowed to continue," revealing that Congress intended that there is a standard to measure EPA's implementation of Section 404(c). *Unacceptable*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/unacceptable (last visited Apr. 6, 2024); *see also Unacceptable*, Merriam-Webster, https://www.merriam-webster.com/thesaurus/unacceptable (last visited Apr. 6, 2024 (defining unacceptable as "wrong" and "falling short of a standard").

120. The use of the term "unacceptable" in Section 404(c) indicates that EPA must consider a variety of different factors in determining whether the alleged adverse effects to anadromous fishery areas in the NFK and SFK are unacceptable. Among other things, EPA should have analyzed the full range of the costs and benefits of prohibiting or restricting discharges before exercising its authority under Section 404(c), including

the loss of economic benefits to the State and local governments. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 733-35 (D.C. Cir. 2016) (Kavanagh, J., dissenting); *see also Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1298 (11th Cir. 2019) (stating Section 404(c) imposes a standard that "is bounded by proximate cause and the rule of reason").

121. In issuing the Final Determination and prohibiting the discharge of dredged and fill material anywhere within the footprint of the Pebble Mine, EPA intended to prevent the mine from proceeding. Further, in restricting discharges of dredged or fill material associated with any future project to construct and operate a mine for the development of the Pebble Deposit with similar or greater impacts, EPA intended to prevent any future large-scale mining activity in the 200,000-acre Designated Area for Restriction.

122. In halting the Pebble Mine and restricting the future development of the Pebble Deposit through its Final Determination, EPA failed to properly consider the full range of costs and benefits of such action, including the enormous amount of revenues that will be lost by Alaska and local Alaskan governments.

123. The land that contains the Pebble Deposit is owned by Alaska. The State acquired this land because of its mineral development potential. The development of these minerals will generate significant revenues for essential services and other governmental operations. Those revenues will be lost if the Pebble Deposit cannot be developed and mined.

124. The FEIS provided estimates of the anticipated revenues that would be generated for the State and local governments. It estimated that the Pebble Mine would generate about $100 million annually through state taxes, licensing fees, and royalty payments. Locally, the Lake and Peninsula Borough would receive approximately $23 million annually in severance taxes from the operation of the mine.

125. Assuming a five-year mine construction phase and a decades-long mine operation phase, the Pebble Mine has been estimated to generate approximately $2.63 billion in revenues for the State. Other sources have estimated that a similar or greater amount of State revenues would be generated by the Pebble Mine, as Alaska explained in its comments on the proposed Section 404(c) determination.

126. The Pebble Mine's adverse effects on WOTUS primarily affect the uppermost portions of the NFK and the SFK. Neither of these streams contains an active commercial or recreational fishery, nor is there any evidence that the loss of headwater streams and associated wetlands in the mine footprint will adversely impact any fisheries downstream. In fact, given the limited number of Pacific salmon observed in streams within the mine site, and the marginal quality of the spawning and rearing habitat conditions in those streams, impacts from the mine on Pacific salmon and other fish are not expected to be noticeable downstream. *See*, *e.g.*, FEIS, Executive Summary at 86-87, Ch. 3 at 24-5.

127. Any adverse effects of the Pebble Mine will be limited to the loss of small headwater streams and associated wetlands in the upper NFK and the SFK and limited downstream effects in those streams. Downstream of the confluence of the Kotuli River

and the Mulchatna River, the effects of the discharge of fill materials on Pacific salmon species as proposed under the Mine Plan for the Pebble Mine will be negligible or simply undetectable. Consequently, the benefits of the prohibiting the construction and operation of the Pebble Mine are limited.

128. There is no credible evidence that the commercial fisheries in Bristol Bay will be adversely impacted by the construction and operation of the Pebble Mine. Indeed, EPA's Final Determination is based on hypothesized adverse effects to anadromous fishery areas in the NFK and the SFK, and not on any adverse effects to the Bristol Bay salmon fisheries.

129. The construction and operation of the Pebble Mine will not cause any employment-related losses or adverse effects to commercial fishing opportunities in Bristol Bay. Harvests of sockeye salmon and other Pacific salmon in Bristol Bay will not be reduced by the Pebble Mine, nor will prices paid for Pacific salmon harvested in Bristol Bay be affected by the Pebble Mine.

130. Other salmon fisheries in Alaska exist in basins with active non-renewable extraction industries. For example, the Cook Inlet salmon fisheries exist in an active oil and gas basin and the Copper River salmon fishery occurs in a watershed with the remains of the historic Kennecott Copper Mine. Both of those salmon fisheries average higher prices per pound than the Bristol Bay salmon fishery.

131. There is no evidence that recreational uses will be adversely affected to any significant extent. The Pebble Mine is located in a remote area with no unique

recreational features or attractions and receives minimal recreational uses. Limited recreational fishing occurs on the Kotuli River (including NFK and SFK).

132. EPA failed to properly account for and consider the substantial revenues that the State and local governments will receive from the construction and operation of the Pebble Mine when it issued the Final Determination. EPA has understated the costs to the State and local governments and overstated the benefits from prohibiting the Pebble Mine. Furthermore, EPA has erroneously emphasized the economic benefits of the Bristol Bay commercial fishery when there is no evidence that the construction and operation of the Pebble Mine will have a measurable impact on fish numbers or otherwise affect the health of the Bristol Bay fishery. Therefore, EPA has failed to engage in reasoned decision-making and has failed to consider all of the factors that are relevant in issuing the Final Determination in violation of the CWA and the APA.

## Fourth Claim for Relief

## (Improper Consideration of Irrelevant Factors)

133. The State incorporates by reference the allegations set forth in paragraphs 1 to 132 hereinabove.

134. The Final Determination was issued pursuant to Section 404(c) of the CWA. Section 404(c) authorizes EPA to prohibit the specification of any defined area as a disposal site for dredged or fill material or to deny or restrict the use of any defined area for specification as a disposal site for dredged or fill material only when EPA "determines . . . that *the discharge of such materials into such area* will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas

(including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c) (emphasis added).

135. Under Section 404(c), EPA's authority is limited to assessing whether discharges of dredged or fill material into defined areas of WOTUS would have unacceptable adverse effects on one or more of five types of resources specified in that provision, including fishery areas.

136. Section 5 of the Final Determination sets forth EPA's "final determination" under Section 404(c). The prohibition on specification within the Defined Area of Prohibition was based on EPA's determination that "the discharges of dredged or fill material for the construction and routine operation of the mine identified in the 2020 Mine Plan . . . at the Pebble deposit will have unacceptable adverse effects on anadromous fishery areas in the SFK and NFK watersheds." Final Determination at 5-1 to 5-2 (footnote omitted).

137. Similarly, the restriction on specification within the Defined Area of Prohibition in Section 5 of the Final Determination was based on EPA's determination that "discharges of dredged or fill material associated with future proposals to construct and operate a mine to develop the Pebble deposit will have unacceptable adverse effects on anadromous fishery areas (including spawning and breeding areas) anywhere in the SFK, NFK, and UTC watersheds if the adverse effects of such discharges are similar or greater in nature and magnitude to the adverse effects of the 2020 Mine Plan described in Sections 4.2.1 through 4.2.4." Final Determination at 5-7 (footnotes omitted).

138. As support for the prohibition of specification and the restriction of specification, EPA relied on four specific "aquatic resource losses and streamflow changes" affecting anadromous fish in the NFK and the SFK, which are described in Sections 4.2.1 through 4.2.4 of the Final Determination. Final Determination at 5-2, 5-7.

139. EPA's Final Determination under Section 404(c) was not based on unacceptable adverse effects on municipal water supplies, shellfish beds, non-anadromous fishery areas, wildlife, or recreation areas.

140. EPA improperly expanded the scope of its analysis to include so-called "secondary effects" that do not result from the discharge of dredged or fill material at a specific disposal site. EPA improperly considered irrelevant effects that result from the construction and operation of the Pebble Mine, such as "fugitive dust," "downstream habitat degradation," and "dewatering," i.e., groundwater pumping in connection with open-pit mining.

141. EPA's authority under Section 404(c) is limited to prohibiting or restricting discharges of dredged or fill material into WOTUS at specific disposal sites based on the effects of such discharges on the five resources set forth in Section 404(c). In this case, EPA has asserted that discharges of dredged or fill material into WOTUS will adversely affect anadromous fishery areas. EPA lacks legal authority to consider effects from other activities associated with the Pebble Mine to support its determination.

142. The Final Determination also includes a separate Section 6 that describes EPA's "other concerns and considerations." These concerns relate to potential impacts from mining the Pebble Deposit on wildlife, recreation, and public water supplies (Final

Determination, § 6.1); the effects of hypothetical spills and failures (Final Determination, § 6.2); concerns allegedly expressed by certain tribal governments (Final Determination, § 6.3); and environmental justice (Final Determination, § 6.3.3).

143. To the extent that EPA relied on any of the "other concerns and considerations" discussed in Section 6 of the Final Determination to support the prohibition of specification and the restriction of specification in the Final Determination, EPA exceeded its statutory authority under Section 404(c) of the CWA and acted unlawfully.

144. The discussion of various irrelevant "other concerns and considerations" in Section 6 of the Final Determination highlights EPA's strong bias against mining and mineral development and are indicative of arbitrary and capricious decision-making by the agency. This discussion also highlights EPA's improper disregard for the State's sovereign interests in its lands and natural resources.

145. Because EPA, in issuing the Final Determination, considered factors that it was not permitted to consider under Section 404(c) of the CWA in prohibiting or restricting the use of defined areas as disposal sites, EPA exceeded its statutory authority and unlawfully relied on factors that it was not permitted to consider. Therefore, the Final Determination is arbitrary, capricious and unlawful, and in excess of EPA's statutory authority.

**<u>Fifth Claim for Relief</u>**

**(Violation of Major Questions Doctrine)**

146. The State incorporates by reference the allegations set forth in paragraphs 1 to 145 hereinabove.

147. When it enacted the CWA, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs* ("*SWANCC*"), 531 U.S. 159, 174 (2001) (alterations in original) (quoting 33 U.S.C. § 1251(b)).

148. "Regulation of land and water use lies at the core of traditional state authority." *Sackett*, 598 U.S. at 679-80.

149. Supreme Court precedent therefore "require[s] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Id.* at 679 (citation omitted).

150. Further, the determination of whether an agency has acted lawfully is "'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted).

151. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

152. Here, EPA has exercised an elephant-sized power through the mousehole of Section 404(c)—asserting that it can regulate some 200,000 acres of *land* owned by the State—and preclude mining activity through the CWA by asserting that this land use activity will have "an unacceptable adverse effect on . . . fishery areas." *See* 33 U.S.C. § 1344(c).

153. Indeed, this action was taken without any attempt to even describe the WOTUS that gives EPA the authority to act pursuant to the CWA, as alleged above, *supra* ¶¶ 69, 76-77, 80-90.

154. The defects in the Final Determination, including the failure to: (1) define WOTUS, (2) detail the affected fisheries, (3) properly weigh costs and benefits of the Final Determination, and (4) consider only relevant factors, each reveal, individually and collectively, that EPA is attempting to expand its authority under the CWA in order to regulate land use activities—specifically mining—to decide a major question traditionally allocated to the State, i.e.: whether the benefits of a land use activity—like a mining project estimated to produce $31.7 billion in revenue and $2.63 billion in tax revenue for the State—outweighs the environmental costs associated with that project. That question is a major policy decision.

155. Nothing in Section 404(c)'s language, or any provision of the CWA, gives EPA the authority to resolve this major policy question and act as a roving zoning commission to regulate and restrict mining or other land use activities, which fall in the traditional police power of the States to regulate. *See Rapanos*, 547 U.S. at 738 ("The extensive federal jurisdiction urged by the Government [under the CWA] would

authorize the Corps to function as a de facto regulator of immense stretches of intrastate land—an authority the agency has shown its willingness to exercise with the scope of discretion that would befit a local zoning board.”). EPA’s Final Determination goes well beyond the express authority that Congress gave EPA under Section 404(c).

156. As the *Rapanos* Court explained, there must be “a ‘clear and manifest’ statement from Congress to authorize an unprecedented intrusion into traditional state authority” like land use regulations. *Id.* (citation omitted). Like the term “waters of the United States” that was at issue in *Rapanos*, here, the term “unacceptable adverse effect” on five specific types of aquatic resources in Section 404(c) is not the type of “clear and manifest statement” that authorizes EPA to intrude into the State of Alaska’s traditional authority to regulate land use by restricting mining activities on 200,000 acres of land due to purported environmental concerns. *See id.* (internal quotations marks omitted).

157. In fact, if EPA is correct that it can exercise its power under Section 404(c) in this fashion to restrict land use activities on vast areas of land, it “would give [EPA] a breathtaking amount of authority” in an area traditionally allocated to the States. *See Ala. Ass’n of Realtors v. Dep’t of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021).

158. EPA has pushed the CWA to “the outer limits of Congress’ power” through the Final Determination without any indication that Congress intended to give EPA the power under Section 404(c) to stop a mining project estimated to generate approximately $31.7 billion in revenue for the State through regulation of 200,000 acres of land. *See SWANCC*, 531 U.S. at 172-73.

159. Thus, EPA acted unlawfully, exceeding its authority under the CWA. *Id.*

160. By attempting to regulate 200,000 acres of land, most of which could not be found to be WOTUS even if EPA had made a jurisdictional determination, through CWA Section 404(c) without any clear statement from Congress providing EPA the authority to do so, EPA unlawfully encroached on the State's sovereignty and went beyond EPA's authority under the CWA, and Section 404(c) specifically. Therefore, the Final Determination is unlawful and in excess of EPA's CWA authority.

## Sixth Claim for Relief

### (Failure to Consider the State of Alaska's Authority and Interests)

161. The State incorporates by reference the allegations set forth in paragraphs 1 to 160 hereinabove.

162. When it enacted the CWA, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with [EPA] in the exercise of [the agency's] authority under this chapter." 33 U.S.C. § 1251(b).

163. The Final Determination unlawfully impinges on "the States' traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174. Alaska's Constitution provides that replenishable natural resources, including fish, must be managed under a "sustained yield principle." Alaska Const. art. 8, § 4. The State has protected wildlife habitat and species through the creation of critical habitat areas and refuges, and it has enacted laws and regulations that regulate activities on or near anadromous fish waters.

164. The Alaska Department of Fish & Game ("ADFG") has broad authority to regulate activities in fish-bearing waters. *See*, *e.g.*, Alaska Stat. §§ 16.05.841, 16.05.871. The State's Anadromous Fish Act, for example, requires that persons proposing activities potentially altering or affecting the "natural flow or bed" of a specified anadromous waterbody notify and obtain written approval from the ADFG. Alaska Stat. § 16.05.871; *see also id.* § 16.05.901 (penalties). All activities conducted within or across any specified anadromous water body must be approved by the ADFG's Habitat Section.

165. Alaska law requires that regional land-use plans providing for the management of State-owned lands be adopted and maintained. In the development of these regional plans, all resource and land uses are considered and evaluated, including mining, fish, wildlife habitat, and recreation. *See* Alaska Stat. § 38.04.065. The State land that contains the Pebble Deposit is governed by the Bristol Bay Area Plan, which authorizes mining in that area subject to review and approval of specific activities by State regulatory agencies. The mineral claims located on and around the Pebble Deposit have been staked and extensively explored subject to the State's oversight and issuance of authorizations.

166. In addition to the Bristol Bay Regional Plan, Alaska statutes expressly protect fisheries in Bristol Bay and prohibit mining in certain areas without express legislative authorization. *See, e.g.*, Alaska Stat. §§ 38.05.140, 38.05.142.

167. EPA failed to take into account Alaska's rights and authority over land and water use, and instead has improperly asserted regulatory control of Alaska's lands and resources.

168. EPA has elevated various irrelevant and inapt considerations and concerns such as hunting, wildlife viewing, hypothetical tailings dam failures, subsistence uses, and environmental justice. In effect, EPA has asserted that Section 404(c) empowers the agency to act as a super-regulator to prevent development of the Pebble Deposit, in derogation of Alaska's sovereign rights and interests as well as its rights as the owner of the land at issue.

169. Consequently, EPA has exceeded its lawful authority under Section 404(c) of the CWA and has failed to acknowledge and defer to Alaska's "traditional and primary power over land and water use" in violation of the CWA. *Solid Waste Authority*, 531 U.S. at 174.

**PRAYER FOR RELIEF**

The State of Alaska respectfully requests that this Court enter a judgment in its favor granting the following relief:

A. Find and declare that EPA violated the CWA and the APA in issuing the Final Determination;

B. Hold unlawful and set aside the Final Determination;

C. Award the State of Alaska its costs of litigation, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D. Provide the State of Alaska such other and further relief as the Court deems just and proper based on EPA's violations of the CWA and the APA.

DATED: April 11, 2024.

FENNEMORE CRAIG P.C.

By: */s/ Norman D. James*

Norman D. James (AZ Bar No. 006901)
Tyler D. Carlton (AZ Bar No. 035275)
2394 East Camelback Road, Suite 600
Phoenix, Arizona 85016
Phone: (602) 916-5000
Facsimile: (602) 916-5546
Email: njames@fennemorelaw.com
tcarlton@fennemorelaw.com
(*pro hac vice applications forthcoming*)

TREG TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl
(Alaska Bar No. 2108081)
Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

Attorneys for Plaintiff

46068645.2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

State of Alaska

**(b)** County of Residence of First Listed Plaintiff __________
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ronald W. Opsahl, AAG SOA, Dept. of Law 1031 W. 4th Avenue, Suite 200, Anchorage, AK 99501, 907-269-5232

## DEFENDANTS

United States Environmental Protection Agency

County of Residence of First Listed Defendant __________
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [x] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
33 U.S.C. § 1344(c)

Brief description of cause:
Challenge to EPA's Final Determination re Pebble Deposit Area, SW Alaska

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE __________ DOCKET NUMBER __________

DATE
04/11/2024

SIGNATURE OF ATTORNEY OF RECORD
JAMES, NORM

Digitally signed by: JAMES, NORM
DN: CN = JAMES, NORM email = njames@fennemorelaw.com OU = FirmUsers, PHX
Date: 2024.04.10 17:29:29 -07'00'

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Alaska

State of Alaska

*Plaintiff*

v.

United States Environmental Protection Agency

*Defendant*

) Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* United States Environmental Protection Agency
C/O Administrator
1200 Pennsylvania Avenue N.W.
Mail Code 1101A
Washington D.C., 20460

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Norman D. James
Tyler Carlton
Fennemore Craig
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85014

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ________________

*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______

was received by me on *(date)* ______ .

❐ I personally served the summons on the individual at *(place)* ______

______ on *(date)* ______ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* ______

______ , a person of suitable age and discretion who resides there,

on *(date)* ______ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* ______ , who is

designated by law to accept service of process on behalf of *(name of organization)* ______

______ on *(date)* ______ ; or

❐ I returned the summons unexecuted because ______ ; or

❐ Other *(specify)*:

.

My fees are $ ______ for travel and $ ______ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______

______
*Server's signature*

______
*Printed name and title*

______
*Server's address*

Additional information regarding attempted service, etc:



Print Save As... Reset